IN THE MATTER OF THE APPLICATION OF THE COUNTY OF HUDSON FOR A DECLARATORY JUDGMENT UNDER THE ACT OF OCTOBER 9TH, 1928.

Argued October 29, 1928—Decided December 13, 1928.

For the county of Hudson, appellant-applicant, *J. Emil Walscheid.*

For the State of New Jersey, *Edward L. Katzenbach,* attorney-general, and *Harry R. Coulomb,* assistant attorney-general.

For the superintendent of elections of Hudson county, *George T. Vickers.*

For the superintendent of elections of Essex county, *Philip Klein.*

The opinion of the court was delivered by

WALKER, CHANCELLOR. The county of Hudson having applied to the Supreme Court for a judgment declaring the rights, status and legal relation of the inhabitants of that county under an act entitled "A supplement to an act entitled 'An act to regulate elections [Revision of 1920, passed May 5th, 1920] and the amendments and supplements thereto,' which supplemental act was passed October 9th, 1928" (*Pamph. L., ch.* 291); and the nine justices of that tribunal sat *in banc* and heard the argument on October 22d, and rendered its decision October 25th, and entered its judgment October 26th, 1928, denying the application. Thereupon the county of Hudson filed in the clerk's office of the Supreme Court an appeal to this court on October 29th, and on that date, October 29th, 1928, requested this court to place the appeal on the present October term (1928) calendar, and expedite its hearing instanter, on the ground that a question of great public interest was involved.

Counsel for the county of Hudson gave notice to the adversary parties thereto, and the motion was heard by the full court in the presence of counsel representing both sides. Concededly, the question is one of great public importance.

As what follows concerns largely the construction of the constitution, it is well to remark *in limine* that in the main the general practice governing the construction of statutes applies also to the construction of constitutions. 12 *C. J.* 690. And in *State* v. *Kelsey* (*Supreme Court*), 44 *N. J. L.* 1, Chief Justice Beasley, speaking of the practical construc-

tion received by a statute, said (at *p.* 22) : "The doctrine has such prevalence that it is applicable not only in the exposition of statutes but in the interpretation of constitutions of government."

By having sat *in banc* and decided this cause in the court below, the nine justices of the Supreme Court, who are constituent members of this court, are disqualified to sit here as members of the Court of Errors and Appeals and take part on the hearing and determination of the appeal in this cause. And this was conceded. It is pertinent, however, to cite the disqualifying part of the constitution, which is as follows:

"When a writ of error shall be brought, no justice who has given a judicial opinion in the cause in favor of or against any error complained of, shall sit as a member, or have a voice on the hearing, or for its affirmance or reversal; but the reasons for such opinion shall be assigned to the court in writing." *Constitution, Art. VI,* § 2, ¶ 6.

And it is pertinent also to cite *Gardner* v. *The State,* 21 *N. J. L.* 557, 558, wherein this court stated that no justice of the Supreme Court who has given a judicial opinion in a case in favor of, or against, an error complained of can sit on error in this court on the hearing and vote for affirmance or reversal; that an affirmance or other judgment (of the Supreme Court) is a judicial opinion. The report of this case is not written under the name of any judge and appears rather to be the reporter's notes of what occurred on the hearing in this court. And this decision in this court has been cited as one of its opinions. See *State* v. *Lester,* 29 *N. J. L.* 541, 542; *State, New Jersey Railroad and Transportation Co., Pros.,* v. *Hancock,* 35 *Id.* 537, 545; *State Board of Assessors* v. *Morris and Essex Railroad Co.,* 49 *Id.* 193, 216; *Hancock, Comptroller,* v. *Singer Manufacturing Co.,* 62 *Id.* 289, 337. And we affirm it to be the law.

The present application being a motion to put the appeal on the list of causes for the present term and advance its argument, not being a hearing of the appeal on the merits involved, the justices of the Supreme Court are not disqualified from sitting with their brethren and voting for or against

the motion. All the justices may sit and vote on the argument of preliminary motions. *Gardner* v. *State, supra,* and on collateral motions. *Engle* v. *Cromlin,* 21 *N. J. L.* 561.

The question now arises, Can a constitutional quorum of this court be assembled for the purpose of hearing the appeal in question? If so, the matter being one of great public importance, it should be put upon the list and the hearing advanced at once. If, however, by reason of the disqualification of the justices of the Supreme Court to sit and participate on the hearing of the meritorious question involved, the numerical strength of this court is reduced below a quorum as provided in the constitution, then, obviously, it would be useless to set the case down and order the hearing thereof, as there would be no court to hear and decide it at this time. That part of the constitution creating this court provides:

"The Court of Errors and Appeals shall consist of the Chancellor, the justices of the Supreme Court, and six judges, or a major part of them." *Constitution, Art. VI,* § 2, ¶ 1.

By the mere reading of this article it is plainly apparent that the constitution means that only a majority of all the judges named to this court can hold a session thereof or transact any business therein. The language is that the court shall consist of "the Chancellor, the justices of the Supreme Court, and six judges, or a major part of them." Let it be observed that after "the Chancellor" is a comma, after "justices of the Supreme Court," a comma, and after "six judges," a comma. Then follows the phrase, "or a major part of them," which must refer back to all of the antecedents, namely, the members provided for in the article. And there is nothing whatever to indicate that it refers only to a part.

On the particular question here involved, namely, what constitutes a quorum of the Court of Errors and Appeals under the constitution of 1844, there is no reported decision (except the *dictum* in *Donohue* v. *Campbell,* 98 *N. J. L.* 755, 761); and that for the obvious reason that the question never before has been raised; but we have no hesitation in holding that the meaning of the article is, that a majority of *all* of the judges, namely, the Chancellor, justices of the Supreme Court,

and the six judges, are "a major part of them," and constitute a quorum within the meaning of the constitution.

*Gibbons* v. *Ogden,* 5 *N. J. L.* 598, was a case in the Court of Appeals under the constitution of 1776. There was more than a quorum present, that is, more than the seven of the court required to make a quorum by that constitution. Two of the judges did not vote, the governor having been of counsel in the cause for one of the parties and declining to vote; another member requested to be excused as he had heard only part of the argument, and this was granted. There were six voting for reversal, five for affirmance, and two not voting. Objection was made to the .judgment given, as the six who voted for it were not a majority of the members, but this court adjudged that a majority of members present and voting is sufficient to a decision of affirmance or reversal where one or more members have been excused, provided a "constitutional quorum" attend and vote. See page 1013. And this is the constant practice of the court, namely, that a majority of the quorum are sufficient to render a decision. See, also, *Clapp* v. *Ely,* 27 *N. J. L.* 622. Gibbons *v.* Ogden is here valuable as indicating that a "constitutional quorum" shall be present to constitute the court; and the constitutional quorum is the question here involved.

Counsel for petitioner-appellant urges that the words "or a major part of them" immediately following the words "and six judges" apply only to the six judges, the object being to maintain in the court at least four "lay" votes representing the purpose of the convention that framed the constitution, to perpetuate in this court the desire of natural equity, to control, or at least affect, the technical tendency of the judges trained in the law, who constitute the other part of the court. And in support of this, reference is made to the proceedings of the convention that framed the constitution, and the compromise said to have been effected as to this court. The judges are referred to throughout the argument of counsel as "lay judges." But there is not a word in the constitution that requires any of the members of this court to be lawyer or layman. It is a fact that for many years the majority of the six

*judges* were laymen, and sometimes all of them have been laymen. But there is nothing controlling in that. The judges are either law or lay accordingly as they are lawyers or laymen, and the bench of judges almost always has had upon it both classes. Just fifty years ago (1878) the six judges of this court were composed of two lawyers and four laymen. It is now composed of four lawyers and two laymen. The lawyers in that class (1878) were Amzi Dodd, before and after that a vice chancellor, and Caleb S. Green, an eminent member of the legal profession. See 40 *N. J. L.* vi. Although there is no qualification for Chancellor or Chief Justice under the constitution of 1844, nevertheless, they have always been appointed from the ranks of the lawyers. And during the period from 1776 to 1844 the Governor was Chancellor, but there was no layman chosen governor, nor was there any lay Chief Justice; although one or more justices of the Supreme Court were laymen during that period.

It certainly never could have been intended by the constitution creating this court—all of whose members might be lawyers and none laymen—that the six judges, or a major part of them, should always be required to sit on errors at law and appeals from Chancery—not even in cases where an actual majority of the whole membership was disqualified. That would indeed be holding the court by less than a quorum in direct violation of the constitutional mandate. And this leads to some observation upon the Supreme Court sitting *in banc;* for, clearly, when the judges divide themselves into parts, say three each, as is now the rule, and only three would be excluded on appeal in ordinary cases, then there would be a constitutional quorum to hear the cause in the court above.

In *Wood* v. *Fithian,* 24 *N. J. L.* 838, a judgment of the Supreme Court on *certiorari* was brought into this court by writ of error; and the first assignment was that the argument was heard and decided by one of the justices of the Supreme Court sitting alone, when at the time three or more justices of the court were then hearing and deciding causes, whereby two Supreme Courts were in session at the same time, not being warranted or authorized by the constitution. The assign-

ment was intended to bring up the question as to the constitutionality of acts of the legislature making it lawful for the justices of the Supreme Court to designate one or more of their members to sit separately for the purpose of hearing and deciding all such matters as by the rules of such court were or might be denominated common business; whose decision should be as good and effectual as if rendered at the bar of the court. And this court held (at *p.* 840): "The justices sitting for the dispatch of common business, have authority, by rule, to order any matters of that description to be set down on the paper, when, in their opinion, the case requires it; and the court have ordered arguments of that class to be heard before all the judges, where the questions involved were difficult or complicated, and the counsel on either side desired it. * * * The constitution, it is true, created but one Supreme Court, to consist of a Chief Justice and four associate justices; but it left it to the legislature to increase or diminish the number to not less than two, and to pass all necessary laws regulating the practice and the mode of transacting business in this court."

Thus it appears that when the court divided itself it was for the purpose of expediting common business, and it follows that for the hearing of the merits of causes it sat *in banc* in all cases. And, as seen, where the questions involved were difficult and complicated, the court might order argument of common business to be heard before all the judges, when the counsel on either side desired it. And by later statute (*Rev.* 216, § 18) it was provided that the Supreme Court might be held by the Chief Justice or any one of the justices; and this is not restricted to the hearing of common business, but is general in its scope and refers to all business; and then follows the provision to divide for the transaction of common business; and so it is in the present act. *Comp. Stat., p.* 1711.

Now, it appears that the constitution having provided for but one Supreme Court, that the justices may at any and all times sit *in banc,* but may divide themselves for the convenient transaction of business, errors or common; and while

this division is made by statute and rule of court, nevertheless, it appears to be an inherent power. And we are not without a guide-post as to this, for in *Gray* v. *Bastedo,* 46 *N. J. L.* 453, Mr. Justice Fort, speaking for the Supreme Court, said (at *p.* 459) : "In *Wood* v. *Fithian,* 4 *Zab.* 838, the power of a single judge to hold the Supreme Court was not questioned, but in the opinion read in the Court of Errors the right was distinctly recognized. True, there was legislation authorizing it, both in the act then under review and in that of January 6th, 1799 (*Rev. L.* 453), but, as I think, it was so considered aside from the provisions of either, they being in that only declaratory of a subsisting authority inherent in the court."

Again, in *Brown* v. *Street Lighting District,* 69 *N. J. L.* 485, the Supreme Court, on the subject of a single justice holding that court, said (at *p.* 486), speaking by Mr. Justice Fort : "The legislature may confer upon a single justice of the Supreme Court the power to hear and determine proceedings in *certiorari* and authorize the entry of his order and direction therein as the judgment of the Supreme Court. *Mott's Practice act,* § 5. By the act relative to the Supreme and Circuit Courts the Supreme Court may be held by the Chief Justice or any one of the justices. *Pamph. L.* 1900, *p.* 350, § 7. The same provision is found in the Revision of 1874, and was carried into that revision from existing statutes. *Gen. Stat., p.* 1023, § 19; *Wood* v. *Fithian,* 4 *Zab.* 838." See, also, *Dubelbeiss* v. *West Hoboken,* 81 *N. J. L.* 98.

If, as we have seen, the power of the Supreme Court to designate less than its whole number to sit for the transaction of business, and that the constitution creates but one Supreme Court, which may sit *in banc* when it chooses, the language of Mr. Justice Van Syckel, speaking for the Supreme Court, in *Traphagen* v. *West Hoboken,* 39 *N. J. L.* 232 (at *p.* 235), is pertinent. He said : "By force of section 1 of article 6 of the new constitution, the nature of the Supreme Court can be altered only by a modification of the constitution itself. Under this constitutional guarantee, the powers which inhered in the court at the time of the formation of the constitution must be unassailable by legislation."

And this court cites Traphagen *v.* West Hoboken with approval in *East Orange* v. *Hussey,* 70 *N. J. L.* 244 (at *p.* 248), and remarks (at *pp.* 247, 248) : "The general doctrine of the immutability of our constitutional tribunals, except by a change of the organic law itself, is firmly established in our jurisprudence."

From the preceding it appears that the question always has been as to the right of the Supreme Court to divide itself into branches for the hearing of causes, and not that it might sit together *in banc;* the latter was always its inherent right.

It is true that at the time of the adoption of the constitution in 1844 the Supreme Court consisted of five members, the Chief Justice and four associates, and that when a writ of error was brought in the Court of Errors and Appeals, there were constitutionally able to sit in review seven judges, namely, the Chancellor and the six appointed judges, and this assumes that all five members of the Supreme Court were disqualified by having sat *in banc,* or otherwise.. But the constitution did not contemplate that the Supreme Court would always consist of five members, as is manifest, for it also provided as follows :

"The Supreme Court shall consist of a Chief Justice and four associate justices. The number of associate justices may be increased or decreased by law, but shall never be less than two." *Constitution, Art. VI,* § 5, ¶ 1.

So that it was just as clearly within the intent of the makers of the organic law (that with the increased population and business) the Supreme Court might be, as it has been, extended into such a number of members as that they would form a majority of the Court of Errors and Appeals, and, consequently, that all or enough of such members being disqualified for any valid reason, there might exist no constitutional quorum to hear an appeal, at least not until by changes in membership of the court of a sufficient number of judges might be assembled for the purpose. And so it is here. An appeal has been taken in this matter, and if at any time in the future the personnel of the court should so change as to make a majority of all the members of the Court of Errors and Ap-

peals able to consider and pass upon it, that may be done; and there are several cases in which this very thing has occurred.

The right of appeal is not given in our constitution. And in *Pennsylvania Railroad Co.* v. *National Docks Railway Co.*, 54 *N. J. Eq.* 647, it is said by Chief Justice Beasley that the right of appeal in this state is the creature of the statute, confirmed by the constitution.

Counsel for appellant urges that the constitutional convention of 1844 made the six judges represent the survival of the council, which, with the governor, was the Court of Appeals under the constitution of 1776, the purpose being, as he already says, to control by natural equity the tendencies of the justices trained in the law by and through the votes of those six judges. And this is said in a brief which concedes that the number of Supreme Court justices was likely to increase (as in fact it has, now increased under the terms of the constitution); that the words "or a major part of them" immediately following the words "and the six judges" apply only to the six "lay judges" representing the purpose of the convention to perpetuate control or at least affect the tendency of the justices trained in the law who constitute the other members of the court. If that were so, and if it had that tendency, the convention had ample opportunity to effect that in the most practical way, namely, by saying so in unmistakable terms, which, significantly, was not done. And, besides, no such tendency exists.

In considering the structure of this court, it was moved in the convention to strike out the words "justices of the Supreme Court," which was defeated by a vote of eighteen ayes to thirty-five nays. *Journal of Convention, p.* 115. Then motion was made to strike out the words "and six judges," which was disagreed to (no vote taken); then it was moved to strike out the words "six" before the word "judges," and insert "ten." And on this motion there were ten ayes and forty-three nays. *Ibid.* 116. Then motion was made to strike out the words "six judges" and insert "members of the senate," and on this question there were eleven ayes and

forty-three nays. *Ibid.* 118, 119. So it will be seen at a glance that the proceedings in the convention do not support, but are directly contrary to, the contention of counsel. The question of "lay" judges has been referred to above. There are none provided. And, besides, the council was not a strictly lay body. As there are lawyers in the senate to-day, there were lawyers in the council between 1776 and 1844. A glance at the record shows that there were many members of the legal profession in the council from time to time, who were eligible to then sit in the Court of Appeals. And some of them were, or became, very eminent lawyers. In the first council (1776) there were thirteen members exclusive of the governor, who was a lawyer, two of which members were lawyers, namely, William Paterson and John Cleve Syms, the latter having been a member of the New York bar. And there is nothing in the convention to show that a compromise was effected. All attempts to change the membership of this court as reported being defeated by overwhelming majority.

The language under discussion is so obvious in its meaning that there is no occasion for exploring the intention of the draftsmen of the constitution. In fact it is not permissible. It is quoted only because counsel refers to it.

The Supreme Court *In re Murphy,* 23 *N. J. L.* 180, held that the intention of the draftsman of a statute, or of the legislature who passed it, not expressed in the statute itself, affords no legitimate ground to control or influence the judicial construction of it.

And the Supreme Court, in *Sooy* ads. *State,* 38 *N. J. L.* 324, speaking by Chief Justice Beasley, used the following significant language (at *p.* 327) : "In construing laws, the court is bound by legal rules, and in order to discover legislative intent, we must look to the statutory language alone, in its application to its subject. We cannot go for such purpose to the journals or debates of the legislature, nor to our own memory; the statute must speak for itself, and we cannot add a syllable to what it speaks."

In *Donohue* v. *Campbell,* 98 *N. J. L.* 755, this court (at *p.* 761), construed a quorum of the Court of Errors and Appeals to be as we have herein construed it. And counsel for the appellant here claims that that expression in Donohue *v.* Campbell was but *dictum* and is not binding on this court. Clearly, it was *dictum; obiter,* and not judicial. *In re Chadwick's Will,* 80 *N. J. Eq.* 168; *Crescent Ring Co.* v. *Traveler's Indemnity Co.,* 102 *N. J. L.* 85. It was made use of to illustrate the fact that as the Hudson County Court of Common Pleas was increased from one to three judges the power to appoint county park commissioners was by operation of law devolved upon the three, two of whom became a quorum. While the *dictum* is not binding upon this court it is entitled to consideration, and we find it to be correct.

It is contended that the constitution of 1776, wherein it provides in Article IX "that the governor and council [seven whereof shall be a quorum] be the Court of Appeals in the last resort in all causes of law as heretofore," gave jurisdiction in errors and law only and not appeals from Chancery (the latter being given by statute of June 13th, 1799) ; and it was argued that that court (the governor and council) consisted of laymen and not justices; and it appears to be the argument that it was the intention of the constitutional convention of 1844 to continue the lay feature of that court. In characterizing that court as one composed of laymen, counsel is in error. William Livingston, the first governor of New Jersey, and member of the Court of Appeals, was a distinguished lawyer. And two of the members of council were lawyers. So the argument about the "lay" membership of that court falls of its own weight.

In *Harris* v. *Vanderveer's Exrs.,* 21 *N. J. Eq.* 424, 433, it was held that the phrase "as heretofore" in article 6, section 1 of the present constitution, if descriptive of the jurisdiction of this court, has no important significance, as the jurisdiction of all constitutional courts, by necessary implication, are established as they existed antecedently to the date of the constitution. And jurisdiction means the power and authority

of a court. *Bouv. Dict.* (*Rawle 3d Rev.*) 1760. And does not concern itself with the personnel of the tribunals.

There is another doctrine which is dispositive of the case *sub judice.* It is that of practical, contemporaneous construction. Said Chief Justice Gummere, speaking for this court in *Com. Roof Co.* v. *Riccio,* 81 *N. J. Eq.* 486 (at *p.* 488) : "Whenever there is a debatable question as to the proper construction of a statutory provision, the contemporaneous and long continued exposition exhibited in the usage and practice under it requires the construction thus put upon it to be accepted by the courts as the true one. *State* v. *Kelsey,* 44 *N. J. L.* (15 *Vr.*) 1; *Fritz* v. *Kuhl,* 51 *Id.* (22 *Vr.*) 191, 200; *McNeal Pipe Co.* v. *Lippincott,* 57 *Id.* (28 *Vr.*) 540." And this applies generally to the construction of the constitution.

In State *v.* Kelsey, cited above, Chief Justice Beasley, speaking for the Supreme Court, after stating the facts, said (at *p.* 21) : "Under this condition of affairs, as this case is to be tried by the court upon its merits as well as the law, this court is obliged to find, and does find, as a matter of fact, that the legislation in question has received a practical construction to the effect stated for a period of time in excess of fifty years. Therefore, to consider the question as to the proper meaning of that legislation as an open one would, in my opinion, be utterly opposed to public policy, precedent and the admitted principles of law. The legal rule is succinctly expressed in the maxim of the civil law, '*contemporanea exposito est fortissima.*' The doctrine has such prevalence that it is applicable not only in the exposition of statutes, but in the interpretation of constitutions of governments. Its antiquity with respect to the English law is evidenced by the comment of Lord Coke, who says: 'Great regard ought, in construing a statute, to be paid to the construction which the sages of the law who lived about that time, or soon after it was made, put upon it, because they were best able to judge of the intention of the makers at the time the law was made.' "

That the Supreme Court has repeatedly sat *in banc* is amply exemplified in the reports. *State* v. *Rogers* (1894), 56 *N. J. L.* 480, was on application by Governor Werts for leave to file an information in the nature of a *quo warranto* against Robert Adrain and Maurice A. Rogers to inquire by what warrant each of them claimed to have, use and enjoy the office of president of the senate of New Jersey. An order to show cause was granted upon Adrain and Rogers, and the rule came on for hearing before the Chief Justice and seven associate justices. Chief Justice Beasley spoke for the majority of the court, and his opinion concludes that Adrain had no title to the office, that Rogers had, and judgment was awarded accordingly. Six justices concurred, and Mr. Justice Abbett, dissenting, concluded that judgment of ouster should be entered against both respondents. It is significant that the late Allan L. McDermott, who was for Robert Adrain, the defeated litigant, never took an appeal, doubtless because he was of opinion that it was useless to do so as no quorum of the Court of Errors and Appeals could be assembled to hear it within a time that would be efficacious. The governor was partially unsuccessful. He prayed a writ against both respondents, and was represented by such distinguished counsel as Richard V. Lindabury, Frederic W. Stevens, afterwards vice chancellor, and John P. Stockton, attorney-general; and they took no appeal, being, undoubtedly, of opinion that in the circumstances it was useless to do so. If an appeal could have been immediately brought on for hearing the astute counsel mentioned undoubtedly would have made the application; and all this is significant on the question of appeal.

An act was passed in 1873 providing for decreeing and making known that certain laws and joint resolutions have become inoperative and void. It provides that when the governor shall have reason to believe that any law or joint resolution was not duly passed or approved as required by the constitution, he may direct the attorney-general to prosecute the facts in the Supreme Court and pray that the law or joint resolution may

be decreed to be null and void, and the court, after hearing, if satisfied that the law or joint resolution was not duly and constitutionally passed or approved, should have jurisdiction and power to decree the same or any part thereof to be null and void, provided that the final hearing shall take place before the Chief Justice and at least three of the associate justices of said court; and that two or more citizens, within the time mentioned, might present a petition, and the court should thereupon proceed in the same manner. *Comp. Stat., p.* 4978, §§ 43, 44, 45. Here is a direct legislative recognition of the fact that the Supreme Court may sit *in banc,* and the act requires the sitting of at least four members of the court. It would, of course, be satisfied with all.

Under this act there have been numerous prosecutions before the court *in banc*—the Chief Justice and three associate justices being required to sit, and all might, of course, sit in such cases.

Reported cases will be found as follows: *In re Public Utility Board* (1912), 83 *N. J. L.* 304, on petition of the attorney-general, before the Chief Justice and the full court; *In re Jaegle* (1912), 83 *N. J. L.* 313, on petition of George W. Jaegle, and Ross M. Wickham. It was heard by the Chief Justice and the full court. *In re Low* (1915), 88 *Id.* 28, on petition of George C. Low and another, was heard by the Chief Justice and the full court. *In re Petition of Attorney-General* (1923), 98 *Id.* 586, was heard by the Chief Justice and seven associate justices. And in none of these cases is there any attempted appeal.

Finally, it may be said that in all the reported cases under the act of 1873, above mentioned, it did not appear that any counsel objected to the court sitting *in banc,* and whether or not counsel requested the hearing and decision of the full court, or that being ordered by the court without such request, if no protest or objection was made, consent thereby was tacitly given, and surely no one not objecting could complain. Consent is manifested by action, or by inaction, or by silence, from which arises an inference that consent has been given.

*Bouv. Dict.* (*Rawle 3d Rev.*) 611. This is the law and is constantly applied by the courts. In *Laure* v. *Singer,* 100 *N. J. L.* 98, we held that where a defendant, besides pleading matter which would oust the jurisdiction, also pleaded to the merits and went to trial on them, was concluded. In the case *sub judice* the petitioner, who is the appellant, made no objection to the right of the entire court to sit *in banc,* and, consequently, is precluded from asserting that a part only, instead of the full court, should have sat upon the hearing and determination of the cause; but such objection, if made, would have been without legal force.

Upon this whole matter we are clearly of opinion that the Supreme Court properly exercised its prerogative of sitting *in banc* upon the hearing of the appellant's application in that court, and that, because a majority of the Court of Errors and Appeals is therefore now disqualified from participating on the hearing and determination of the appeal, a constitutional quorum of this court cannot be convened at this time to hear and determine it; and, therefore, the cause on appeal should not now be listed and ordered for argument.

Although on a motion no vote is taken, but the decision only is announced; nevertheless, I am authorized to say that the entire court concurs in the decision reached in this case; Judge White differing on certain views of the law, as stated in his opinion filed herewith.

WHITE, J. (concurring). My vote on this application is based upon what I consider to be a waiver by the applicants of their constitutional right of appeal to the Court of Errors and Appeals. This waiver I think resulted from their voluntarily and without protest submitting their case to the decision of the Supreme Court, sitting *in banc,* thereby consenting to a destruction of a constitutional quorum of the Court of Errors and Appeals to hear the case upon appeal from the decision of the Supreme Court, so sitting. I think the constitution vests in all litigants the right, unless that right be waived, of appealing to the Court of Errors and Appeals in

all causes, and that this right cannot be defeated by anything not contained in the constitution itself. I also think the quorum of the Court of Errors and Appeals is definitely fixed by the constitution to be a majority of the entire membership of that court and not merely a majority of those members who are not disqualified to sit in any particular case. If this is so I do not think the members of the Supreme Court have the right under these provisions of the constitution to disqualify themselves to sit as members of the Court of Errors and Appeals to such an extent as will destroy the constitutional quorum of the latter court except upon a waiver by the litigant of his right of appeal by his consent to such destruction.

When the constitution of 1844 was adopted there were only five Supreme Court justices and the total membership of the Court of Errors and Appeals was consequently twelve, and a quorum of that court was seven. The sitting of the Supreme Court *in banc,* thereby withdrawing five members from the Court of Errors and Appeals, would then still leave a quorum of that court to function. It is quite likely that the constitutional provisions in this respect were adopted with this purpose in mind. Then in 1845, quite possibly with the same purpose of insuring a Court of Errors and Appeals quorum under any circumstances, the legislature provided for the Supreme Court dividing itself into "branch courts." *Dubelleiss* v. *West Hoboken,* 81 *N. J. L.* 98.

I think, therefore, there has always been provided a way whereby litigants may preserve for themselves their right of appeal, if they desire it, to a constitutional quorum of the Court of Errors and Appeals, by asserting before the Supreme Court the right to be heard by one of the branches of that court instead of by that court sitting *in banc,* in order that such constitutional quorum of the Court of Errors and Appeals should not be destroyed. That it would be the duty of the Supreme Court to grant such an application for a hearing by a branch of that court instead of by the court sitting *in banc* in order that the applicant's constitutional right of ap-

peal should not be destroyed, seems to me quite obvious, because the Supreme Court is governed by the purpose of the provisions of the constitution to the same extent as are all other judicial bodies provided for thereby. True, the power and practice of the Supreme Court to sit *in banc* existed prior to and at the time of the adoption of the constitution of 1844, and consequently continued after such adoption except as modified or curtailed by the provisions, or by the implications necessarily resulting from the provisions of that instrument. The creation by that constitution of the "Court of Errors and Appeals in all causes," with a membership embracing the Supreme Court justices and a limitation whereby it could only function by a quorum consisting of a major part of its entire membership, it seems to me, in a case where it is propesed that the entire membership of the Supreme Court should sit *in banc* to hear in the latter court a cause which the court is advised is intended to be appealed to the Court of Errors and Appeals, gives rise to a situation where the right of the Supreme Court to hear the case *in banc* must be held to be non-existent because of constitutional curtailment of its power to so sit in such a case, or else it must be held that the express provisions of the constitution giving all litigants the right of appeal to the Court of Errors and Appeals in all causes and to a hearing by a major part of the entire membership of that court are, under such circumstances, null and void. I cannot think that express constitutional provisions can be thus wiped out of existence.

I dissent, therefore, from the idea that while the appellant must be taken to have waived his right to appeal by failing to object to a hearing by the Supreme Court sitting *in banc,* "such objection, if made, would have been without legal force." I think such objection would have had legal force and that that is the very reason why the failure to make such objection operated as a waiver. Surely a waiver of a constitutional right cannot result from a failure to make a legally futile objection.