828 A.2d 840

ANNE M. MCNEIL, THOMAS E. WILLIAMS, ROSEANNA SIEBERT, PAUL DIGAETANO AND KEVIN O'TOOLE, PLAINTIFFS-RE-SPONDENTS, v. THE LEGISLATIVE APPORTIONMENT COMMISSION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT, AND REGENA L. THOMAS, SECRETARY OF STATE OF NEW JERSEY AND PETER C. HARVEY, ACTING ATTORNEY GENERAL OF NEW JERSEY, DEFENDANTS-RE-SPONDENTS.

Argued April 28, 2003—Decided July 31, 2003.

*Sam Hirsch,* a member of the District of Columbia and Maryland bars and *Leon J. Sokol* argued the cause for appellant (*Sokol, Behot and Fiorenzo, Scarinci & Hollenbeck* and *Genova Burns & Vernoia,* attorneys; *Mr. Hirsch* and *Paul M. Smith,* a member of the District of Columbia and Maryland bars, of counsel; *Mr. Sokol, Steven N. Siegel, Donald Scarinci, Robert E. Levy, Nomi Irene Lowy, Angelo J. Genova, Celia S. Bosco* and *Laura H. Corvo,* on the briefs).

*Allison E. Accurso,* Assistant Attorney General, argued the cause for respondents Regena L. Thomas and Peter C. Harvey (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney; *Donna Kelly,* Senior Deputy Attorney General, on the letters in lieu of brief).

*Kevin B. Riordan,* argued the cause for respondents Anne M. McNeil, Thomas E. Williams, Roseanna Siebert, Paul DiGaetano and Kevin O'Toole (*Berry, Sahradnik, Kotzas, Riordan & Benson,* attorneys).

*Michael A. Armstrong,* submitted a brief on behalf of *amicus curiae* Black Ministers' Council of New Jersey (*Mr. Armstrong,* attorney; *Mr. Armstrong* and *Darrin Howard,* on the brief).

*Lawrence S. Lustberg* and *Shavar D. Jeffries,* submitted a letter brief on behalf of *amicus curiae* New Jersey State Conference of

Branches of the National Association for the Advancement for Colored People.

*JoAnne Y. Watson,* Corporation Counsel, submitted a letter in lieu of brief on behalf of *amicus curiae* City of Newark.

The opinion of the Court was delivered by

COLEMAN, J.

No redistricting plan adopted in New Jersey since the inception of the "one person, one vote" doctrine in 1964 has conformed with our State Constitution's political boundary requirement for the State's two largest municipalities. Since that time, Newark and Jersey City have been divided into at least three districts each. The issue raised in this appeal is whether the New Jersey Constitution's political boundary requirement now can be validly enforced with respect to Newark and Jersey City. We conclude that it may not without violating the Supremacy Clause.

I.

After every decennial United States Census, a bipartisan New Jersey Legislative Apportionment Commission (Commission) is created to redraw the forty Senate and Assembly districts and to apportion Senators and Assemblypersons among those districts. *N.J. Const.* art. IV, § 2, ¶ 1. The Commission consists of ten members, five members appointed by each State Committee for the two major political parties. *N.J. Const.,* art. IV, § 3, ¶ 1. On March 8, 2001, the Governor of New Jersey received the official report from the 2000 Census. The Commission has one month, following receipt of the census to certify by a majority of the Commission, a redistricting and reapportionment plan. Both the Republicans and the Democrats proposed separate plans containing three districts for Newark and Jersey City; neither plan received a majority vote.

Pursuant to Article IV, Section 3, Paragraph 2 of the New Jersey Constitution, when the Commission reached an impasse,

Chief Justice Poritz appointed an independent eleventh member, Dr. Larry Bartels. Following that appointment, the Commission was allowed an additional month to redistrict and reapportion. *N.J. Const.* art. IV, § 3, ¶ 2. On April 11, 2001, the Commission adopted the Bartels plan, which was a modified version of the plan proposed by the Democrats. The vote was six to one; the only dissent came from the one Republican member present for the vote. The plan divided Newark and Jersey City into three districts each. That plan divided Newark among the 27th, 28th and 29th districts and divided Jersey City among the 31st, 32nd and 33rd districts.

On the same day that the plan was filed with the New Jersey Secretary of State, the Republicans and others subject to the ripple effect of that plan, filed suit in the United States District Court for the District of New Jersey to block implementation of the plan. *Page v. Bartels,* 144 *F.Supp.*2d 346, 349 (D.N.J.2001). The *Page* plaintiffs alleged that the Commission's actions violated Section 2 of the Voting Rights Act of 1965 and plaintiffs' Due Process and Equal Protection rights under the Fourteenth and Fifteenth Amendments of the United States Constitution. *Id.* at 349–50. The plaintiffs argued that the Bartels plan would dilute the minority vote. *Id.* at 353. The Commission urged that the plan divided Newark and Jersey City into three districts, as had been the case for nearly four decades, to spread out black and Hispanic voters into a number of districts, *id.* at 353–54, a process commonly referred to as "unpacking." *See Robertson v. Bartels,* 148 *F.Supp.*2d 443, 459 (D.N.J.2001). The three-judge panel established pursuant to 28 *U.S.C.A.* § 2284[1] ruled in favor of the Commission. *Page, supra,* 144 *F.Supp.*2d at 369.

Fifteen days after *Page* had been filed and was still pending, the Republicans brought a new challenge in federal court. *Robertson,*

---

[1] Voting rights claims are heard by a statutory three-judge federal district court with a right of direct appeal to the Supreme Court. 28 *U.S.C.A.* § 1253 and § 2284.

*supra,* 148 *F.Supp.*2d at 446. In that case, plaintiffs alleged that the 2001 plan resulted in unconstitutional racial gerrymandering in violation of the Fourteenth Amendment. *Ibid.* The *Page* court upheld the plan under the Voting Rights Act as well as the Fourteenth and Fifteenth Amendments on May 7, 2001. *Page, supra,* 144 *F.Supp.*2d at 369. Similarly, the *Robertson* court concluded on June 18, 2001, that the Bartels plan satisfied all applicable federal and state criteria for redistricting. *Robertson, supra,* 148 *F.Supp.*2d at 458. The Supreme Court summarily affirmed that determination on January 22, 2002. 534 *U.S.* 1110, 122 *S.Ct.* 914, 151 *L.Ed.*2d 881. The general election in 2001 and the primary election in 2003 were conducted under the Bartels plan.

The complaint in the present case was filed on May 9, 2001, alleging that because the Bartels plan carves Newark and Jersey City each into three legislative districts, it violates the plain language of Article IV, Section 2, Paragraph 3 of the New Jersey Constitution. That provision establishes the political boundary requirement for districts by providing that "[u]nless necessary to meet the [contiguity, compactness or equal population] requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the state...." *Ibid.* Of the 566 municipalities in this State, Newark and Jersey City, the two largest, are the only ones whose political boundaries have been breached by the Bartels plan.

On cross-motions for summary judgment, the trial court ruled, among other things, that the Commission was not bound by the restrictions set forth in Article IV, Section 2, Paragraph 3. More particularly, the court held that the abrogation of the county-line mandate, announced first in *Scrimminger v. Sherwin,* 60 *N.J.* 483, 291 *A.*2d 134 (1972), and subsequently reexamined and reaffirmed in *Davenport v. Apportionment Commission,* 65 *N.J.* 125, 319 *A.*2d 718 (1974), released the Commission from the necessity of adhering to the whole-municipality concept in cases of large

municipalities such as Newark and Jersey City. The court, therefore, granted summary judgment to the Commission.

The Appellate Division reversed, declaring that the language of Article IV, Section 2, Paragraph 3 that requires dividing Newark and Jersey City into two districts never was invalidated under our prior case law but remains the starting point for legislative apportionment. The court, in effect, granted summary judgment in favor of plaintiffs, remanding the case to the Commission for creation of a redistricting plan that conforms with our Constitution. We granted the Commission's petition for certification, 176 *N.J.* 71, 819 *A.*2d 1187 (2003), and stayed the Appellate Division judgment. We now reverse.

## II.

### A.

The analysis must begin with a historical review of Article IV, Section 2, Paragraph 3 of the New Jersey Constitution because, as Justice Oliver Wendell Holmes said, "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 *U.S.* 345, 349, 41 *S.Ct.* 506, 507, 65 *L.Ed.* 963, 983 (1921). Another famous jurist, Judge Learned Hand, teaches that literalism must be avoided because "[t]here is no surer way to misread any document than to read it literally." *Guiseppi v. Walling,* 144 *F.*2d 608, 624 (2d Cir.1944) (Hand, J., concurring), *aff'd sub nom., Gemsco, Inc. v. Walling,* 324 *U.S.* 244, 65 *S.Ct.* 605, 89 *L.Ed.* 921 (1945). *See LaFage v. Jani,* 166 *N.J.* 412, 431, 766 *A.*2d 1066, 1075–76 (2001) (citing *Jersey City Chapter Prop. Owner's Protective Ass'n v. City Council,* 55 *N.J.* 86, 100, 259 *A.*2d 698, 706 (1969)). The history and evolution of our state constitutional provision pertinent to legislative reapportionment and redistricting are informative of our disposition of this case.

In 1962, *Baker v. Carr,* 369 *U.S.* 186, 200, 82 *S.Ct.* 691, 701, 7 *L.Ed.*2d 663, 675, held that federal courts have jurisdiction to decide whether a state apportionment plan for election to its

legislature violates the Fourteenth Amendment. At the time *Baker* was decided, the 1947 New Jersey Constitution, Article IV, Section 2, Paragraphs 3 and 4, allocated at least one Senator and one Assemblyperson from each county regardless of population. *Jackman v. Bodine,* 78 *N.J.Super.* 414, 434, 188 *A.2d* 642, 652–53 (Ch.Div.1963). That prompted Christopher Jackman, a resident of West New York in Hudson County, and Winfield Chasmar, a resident of Verona in Essex County, to file a case in the Chancery Division claiming that the New Jersey Constitution violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 417, 188 *A.2d* at 643. Then–Judge Pashman sitting in the Chancery Division rejected plaintiffs' claims. *Id.* at 434, 188 *A.2d* at 652.

On direct appeal, this Court, after withholding its decision until a group of cases had been decided by the United States Supreme Court, including *Reynolds v. Sims,* 377 *U.S.* 533, 568, 84 *S.Ct.* 1362, 1385, 12 *L.Ed.*2d 506, 531 (1964) (establishing the "one person, one vote" principle), declared that the legislative article of our State Constitution was invalid. *Jackman v. Bodine,* 43 *N.J.* 453, 473, 205 *A.2d* 713, 724 (1964) (*Bodine I*). The Court concluded that based on *Reynolds,* the Equal Protection Clause demands that in a bicameral state legislature, such as New Jersey's, the seats of both houses must be apportioned substantially based on population. *Id.* at 458, 205 *A.2d* at 715 (citing *Reynolds, supra,* 377 *U.S.* at 568, 84 *S.Ct.* at 1385, 12 *L.Ed.*2d at 531). The Court made it clear that apportionment and districting should be accomplished through the legislative branch rather than the judicial branch because "the prescription of a [new legislative] plan of apportionment is laden with political controversy from which the judiciary cannot be too distant." *Id.* at 473, 205 *A.2d* at 724.

*Jackman v. Bodine,* 43 *N.J.* 491, 493, 205 *A.2d* at 735 (1964) (*Bodine II*), held that a resolution adopted by the Senate on November 16, 1964, following arguments in *Bodine I,* but nine days before the decision was rendered, providing for "weighted voting" was invalid. The Court reasoned that a single chamber of a

bicameral legislature could not establish the procedure creating a new apportionment-districting plan. *Ibid.*

In *Jackman v. Bodine*, 44 *N.J.* 312, 315, 208 *A.*2d 648, 649 (1965) (*Bodine III*), the President of the Senate sought permission of the Court to permit the November 1965 election to proceed under the legislative plan that had been invalidated in *Bodine I.* The Court rejected the request and required a statutory remedy pending a constitutional convention. *Id.* at 316, 208 *A.*2d at 650. Thereafter, the Legislature adopted a plan for the temporary reapportionment of the Legislature, *L.* 1965, *c.* 19, codified as *N.J.S.A.* 52:10B–1 *et seq.*, repealed by *L.* 1979 *c.* 431, § 1, eff. Feb. 14, 1980, that "continued the present apportionment of the General Assembly and established an interim plan for the Senate." *Jackman v. Bodine*, 44 *N.J.* 414, 416, 209 *A.*2d 825, 826 (1965) (*Bodine IV*). An application to invalidate that statutory plan was rejected because "[t]he pressing immediate need is to obtain a legislative body substantially close to the demands of *Reynolds v. Sims.*" *Id.* at 420–21, 209 *A.*2d at 828–29. Therefore, the November 1965 election was conducted under a temporary statutory scheme rather than a constitutional provision.

At the general election held November 8, 1966, the voters of New Jersey adopted amendments to the New Jersey Constitution, including Article IV, Section 2, to correct the malapportioned Legislature condemned in *Reynolds* and *Bodine I.* Article IV, Section 2, Paragraph 1 provides that the Senate shall consist of forty members who would be apportioned among districts constructed based on proportionality of population. In addition, Article IV, Section 2, Paragraph 3 provides that the General Assembly shall consist of eighty members, two Assemblypersons for each Senator. The 1966 amendments were attacked in *Jackman v. Bodine*, 49 *N.J.* 406, 231 *A.*2d 193 (1967) (*Bodine V*). The *Bodine* V Court required some district lines to be altered in order to reduce population deviation. *Id.* at 415, 231 *A.*2d at 198. The Court also held that, although population discrepancies between Assembly districts within each Senate district had to be corrected,

the Commission need not recertify the Assembly districts until prior to the 1969 election. *Id.* at 419–20, 231 *A.*2d at 200–01.

Following *Bodine V*, the Commission reconvened and prepared a new redistricting plan with respect to four counties. *Jackman v. Bodine,* 50 *N.J.* 127, 128, 232 *A.*2d 419, 420 (1967) (*Bodine VI*). As a result of that modified redistricting plan, this Court was asked to intervene. *Ibid.* After the trial court upheld the Commission plan, this Court examined that redistricting plan and concluded that the adopted plan contained the smallest possible population deviation and that the districts sufficiently were compact to survive the challenge. *Id.* at 128–29, 232 *A.*2d at 419–20. This Court concluded that because there was insufficient time to remand to the Commission for additional consideration, the election should be conducted under the existing plan as had occurred in *Bodine V. Id.* at 129–30, 232 *A.*2d at 420–21.

The Commission did not recertify a new legislative plan under the *Bodine V* and *VI* guidelines until April 1969. *Jackman v. Bodine,* 53 *N.J.* 585, 587, 252 *A.*2d 209, 210 (1969), *cert. denied,* 396 *U.S.* 822, 90 *S.Ct.* 63, 24 *L.Ed.*2d 73 (1969) (*Bodine VII*). The primary objection to the Commission plan was that recent United States Supreme Court cases, such as *Kirkpatrick v. Preisler,* 394 *U.S.* 526, 89 *S.Ct.* 1225, 22 *L.Ed.*2d 519 (1969), and *Wells v. Rockefeller,* 394 *U.S.* 542, 89 *S.Ct.* 1234, 22 *L.Ed.*2d 535 (1969), did not permit *any* population deviation to occur in order to comply with county or municipal boundaries. *Bodine VII, supra,* 53 *N.J.* at 587, 252 *A.*2d at 210. This Court noted that *Reynolds* held that population deviations *may* occur when dealing with political subdivisions, and that *Kirkpatrick* and *Wells,* which dealt with congressional districting and not the apportionment of a state legislature, did not abandon that notion. *Id.* at 587–88, 252 *A.*2d 209 (citing *Reynolds, supra,* 377 *U.S.* at 580, 84 *S.Ct.* at 1391, 12 *L.Ed.*2d at 538) (emphasis added). Significantly, *Bodine VII* recognized that "[i]t may, therefore, be necessary to depart from the State Constitution's insistence that county and municipal lines be respected." *Id.* at 588, 252 *A.*2d at 210.

Subsequent to the November 1969 elections, the Court heard argument in respect of whether the apportionment plan could have adhered to the county, municipal, and ward lines in the State's two largest cities, Newark and Jersey City. *Bodine VII, supra,* 53 *N.J.* at 589, 252 *A.*2d at 211. The Court held that because the Commission's recertified plan made "modest" improvements and given the time constraints, the results were satisfactory for the 1969 elections. *Ibid.*

This Court decided the final *Jackman v. Bodine* case in 1970 and examined whether the redistricting plan under the New Jersey Constitution is compatible with federal requirements. 55 *N.J.* 371, 374, 262 *A.*2d 389, 391 (*Bodine VIII*), *cert. denied,* 400 *U.S.* 849, 91 *S.Ct.* 39, 27 *L.Ed.*2d 87. In examining precedents, the Court concluded that *Reynolds, supra,* 377 *U.S.* at 577, 84 *S.Ct.* at 1390, 12 *L.Ed.*2d at 536, accepted districts as constitutional even though those districts may have departed from a strict numerical calculation of the one-person, one-vote principle. *Bodine VIII, supra,* 55 *N.J.* at 377–78, 262 *A.*2d at 392–93. Therefore, *Bodine* VIII addressed departures from mathematical equality among districts and held that tolerances were still permissible under *Reynolds* because apportionment of a state legislature is different from redistricting for congressional elections. *Id.* at 378–79, 262 *A.*2d at 393–94. In addressing the problem of gerrymandering and adherence to political subdivisions, the Court stated that "the use of existing county and municipal lines does not foreclose partisan selection of district lines, but it does limit that opportunity and does tend to make the political party responsible for the district plan more readily accountable at the polls." *Id.* at 379, 262 *A.*2d at 393.

Two years after the final *Bodine* case was decided in 1970, this Court decided another case that addressed reapportionment of the State Legislature based on the one-person, one-vote doctrine. In *Scrimminger v. Sherwin, supra,* 60 *N.J.* at 495, 291 *A.*2d at 141, the redistricting plan based on the 1970 census was found to be invalid. The issue presented was the constitutionality of dividing

counties into two or more districts under *N.J. Const.* Article IV, Section 2, Paragraph 3. *Id.* at 486–87, 291 *A.*2d at 136–37. New Jersey's twenty-one counties contained substantial variations in population. *Id.* at 487, 291 *A.*2d at 137. This Court held that the counties under the 1970 Census "cannot constitute separate districts. Nor are they suitable building blocks for the formation of meaningful districts." *Ibid.* It became clear that New Jersey's constitutional requirement mandating apportionment of the forty Senators among districts without exceeding permissible tolerances from mathematical equality conflicted with the mandate that each district " 'shall be composed, wherever practicable, of one single county, and, if not so practicable, of two or more contiguous whole counties.' " *Id.* at 488, 291 *A.*2d at 137 (quoting *N.J. Const.* art. IV, § 2, ¶ 1). The Court stated that, "[t]hus election by districts necessarily departs from the ideal of equality among voters." *Id.* at 490, 291 *A.*2d at 138. The state constitutional requirement of adherence to county lines when redistricting was found to be unenforceable because when some counties elect one Senator and others elect multiple Senators, there is an inequality. *Id.* at 495–96, 291 *A.*2d at 141–42 The Court further stated that although "[m]unicipalities are ... appropriate building blocks for the creation of districts[,] [t]he boundaries of the larger municipalities will of course have to be breached, and in this regard, the Commission may have to depart from the direction in [Art. IV], § [2], ¶ 3, concerning the division of a municipality." *Id.* at 498, 291 *A.*2d at 142.

*Scrimminger* also addressed the question "whether deviations from population equality among districts should be tolerated." *Id.* at 490, 291 *A.*2d at 138. After examining the Supreme Court cases of *Connor v. Williams,* 404 *U.S.* 549, 92 *S.Ct.* 656, 30 *L.Ed.*2d 704 (1972); *Whitcomb v. Chavis,* 403 *U.S.* 124, 91 *S.Ct.* 1858, 29 *L.Ed.*2d 363 (1971); and *Abate v. Mundt,* 403 *U.S.* 182, 91 *S.Ct.* 1904, 29 *L.Ed.*2d 399 (1971), the Court held that the apportionment plan under consideration was invalid because it violated the permissible population deviation required to satisfy *Reynolds. Scrimminger, supra,* 60 *N.J.* at 492–95, 291 *A.*2d at 139–41.

Consequently, the matter was remanded to the Commission to prepare another plan. *Id.* at 498, 291 *A.*2d at 143.

The new plan certified by the Commission formed the basis for challenges in *Davenport v. Apportionment Commission,* 63 *N.J.* 433, 308 *A.*2d 3 (1973) (*Davenport I*). The Court examined a number of recent federal cases and reaffirmed its holdings in *Scrimminger. Id.* at 446, 308 *A.*2d at 9. The Court reserved on the issue whether "the Constitution commands that there shall be placed within *whole* counties as many of the 40 Senate districts as can be." *Id.* at 447–48, 308 *A.*2d at 10.

The last time this Court addressed an apportionment issue was in *Davenport v. Apportionment Commission,* 65 *N.J.* 125, 319 *A.*2d 718 (1974) (*Davenport II*). Justice Sullivan began his opinion for the Court by stating that *Scrimminger* "held that Senate districts should be created without regard to the county-line theme of the State Constitution." *Id.* at 128–29, 319 *A.*2d at 719–20. He stated that the holding was "bottomed on the United States Supreme Court decisions in *Whitcomb v. Chavis; Abate v. Mundt,* and *Connor v. Williams,* holding that substantial equality of population among legislative districts was the overriding object of the one-man, one-vote principle." *Id.* at 129, 319 *A.*2d at 719–20 (citations omitted).

The Court also observed that the language of the last sentence in Article IV, Section 2, Paragraph 3 contemplates that when "dividing a multi-member Senate district into Assembly districts, the requirement of population equality may compel some division of larger counties and municipalities." *Davenport, supra,* 65 *N.J.* at 132, 319 *A.*2d at 721. *Davenport II* also states that based on the 1970 census, *Scrimminger* declared our "State constitutional mandate with respect to using counties" to determine the districting structure violated "the Federal Constitution under the one-man, one-vote principle." *Id.* at 132, 319 *A.*2d at 721 (footnote omitted). *Davenport II* reaffirmed that principle and stated that "the county concept ceased to have any viability in the creation of Senate districts." *Id.* at 133, 319 *A.*2d at 722. The *Davenport II*

Court reemphasized "that population equality is distinctly paramount to [compactness] and that where districts are created on the basis of existing political subdivisions, compactness becomes a much reduced factor." *Id.* at 133–34, 319 *A.*2d at 722 (citing *Bodine V, supra,* 49 *N.J.* at 419, 231 *A.*2d at 200).

Finally, *Davenport II* acknowledged that the role of the judiciary in reviewing a redistricting plan is limited in that "[t]he judiciary is not justified in striking down a plan, otherwise valid, because a 'better' one, in its opinion, could be drawn." *Id.* at 135, 319 *A.*2d 718 (citing *Gaffney v. Cummings,* 412 *U.S.* 735, 753, 93 *S.Ct.* 2321, 2331, 37 *L.Ed.*2d 298, 312 (1973)). The Court also concluded that Senate districts do not have to be placed in whole counties under any constitutional mandate. *Id.* at 132–33, 319 *A.*2d at 722. "[W]e think it clear that attempting to preserve some semblance of county voting strength would create a plethora of constitutional problems." *Id.* at 133, 319 *A.*2d at 722.

All of our state laws regarding apportionment for election to our State Legislature are subject to federal laws. Based on the Supremacy Clause, *U.S. Const.* art. VI, cl. 2, Article IV, Section 2, Paragraph 3 of the New Jersey Constitution dealing with legislative apportionment and redistricting, may not violate the federal Voting Rights Act, 42 *U.S.C.A.* § 1973, (VRA), that became effective August 6, 1965. Section 2 of the VRA provides:

§ 1973. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to

office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

[42 *U.S.C.A.* § 1973.]

We therefore reaffirm this Court's pronouncements in *Bodine VII*; *Scrimminger,* and *Davenport II* that the literal language in our State Constitution with respect to political boundaries for counties and the two largest municipalities has to be breached based on the Supremacy Clause in order to comply with the federal law. That has been the position of this Court since *Bodine VII* was decided in 1969, only three years after the 1966 constitutional amendments at issue here, and that position was reaffirmed in 1970 in *Scrimminger.* Consequently, the Law Division correctly concluded that the New Jersey Constitution's municipal boundary requirement, as interpreted by this Court for more than a quarter of a century, is not enforceable against Newark and Jersey City.

### B.

We acknowledge that in *Bodine VII*; *Scrimminger,* and *Davenport II* the Court did not directly address the enforceability of the two-district limitation of our State Constitution. This is the first time since 1966 that that issue has been raised. We have concluded that the two-district limitation is unenforceable not only because of the principles we articulated in those opinions. There is yet another significant dimension of the Supremacy Clause compelling our conclusion that the Commission was justified in dividing Newark and Jersey City into more than two districts each despite the language of the New Jersey Constitution. The source of federal preemption lies not only in the federal constitutional mandate of one-person one-vote, but also in the VRA, which is designed to protect and advance the opportunity of minorities for full participation in the electoral process and their opportunity to elect representatives of their choosing. That principle has been made clearer recently by Justice O'Connor in *Georgia v. Ashcroft,*

539 *U.S.* ——, 123 *S.Ct.* 2498, 156 *L.Ed.*2d 428, 2003 *WL* 21467204, at *13 (2003) (No. 02–182 (2003)) in dealing with Section 5 of the VRA:

> The ability of minority voters to elect a candidate of their choice is important but often complex in practice to determine. In order to maximize the electoral success of a minority group, a State may choose to create a certain number of "safe" districts, in which it is highly likely that minority voters will be able to elect the candidate of their choice. [*See Thornburg v. Gingles,* 478 *U.S.* 30, 48–49, 87–89, 106 *S.Ct.* 2752, 2765, 2785, 92 *L.Ed.*2d 25, 45–46, 70–72 (1986) (O'Connor, J., concurring in judgment).] Alternatively, a State may choose to create a greater number of districts in which it is likely—although perhaps not quite as likely as under the benchmark plan—that minority voters will be able to elect candidates of their choice. [*See id.* at 88–89, 106 *S.Ct.* at 2786–87, 92 *L.Ed.*2d at 70–72 (O'Connor, J., concurring in judgment)]; *cf.* Pildes, *Is Voting–Rights Law Now at War with Itself? Social Science and Voting Rights in the 2000s,* 80 *N.C.L.Rev.* 1517 (2002).
>
> Section 5 does not dictate that a State must pick one of these methods of redistricting over another. Either option "will present the minority group with its own array of electoral risks and benefits," and presents "hard choices about what would truly 'maximize' minority electoral success." *Thornburg v. Gingles, supra,* [478 *U.S.* at 89, 106 *S.Ct.* at 2786, 92 *L.Ed.*2d at 71–72] (O'Connor, J., concurring in judgment). On one hand, a smaller number of safe majority-minority districts may virtually guarantee the election of a minority group's preferred candidate in those districts. Yet even if this concentration of minority voters in a few districts does not constitute the unlawful packing of minority voters, *see Voinovich v. Quilter,* 507 *U.S.* 146, 153–154,[113 *S.Ct.* 1149, 1155–56, 122 *L.Ed.*2d 500, 511–12] (1993), such a plan risks isolating minority voters from the rest of the state, and risks narrowing political influence to only a fraction of political districts. [*Cf. Shaw v. Reno,* 509 *U.S.* 630, 648–650, 113 *S.Ct.* 2816, 2827–28, 125 *L.Ed.*2d 511, 529–31 (1993).] And while such districts may result in more "descriptive representation" because the representatives of choice are more likely to mirror the race of the majority voters in that district, the representation may be limited to fewer areas. *See* H. Pitkin, The Concept of Representation 60–91 (1967).
>
> On the other hand, spreading out minority voters over a greater number of districts creates more districts in which minority voters may have the opportunity to elect a candidate of their choice. Such a strategy has the potential to increase "substantive representation" in more districts, by creating coalitions of voters who together will help to achieve the electoral aspirations of the minority group. *See id.* at 114. It also, however, creates the risk that the minority group's preferred candidate may lose.
>
> [*Georgia, supra,* 539 *U.S.* at ——, 123 *S.Ct.* at 2511, 156 *L.Ed.*2d at ——, 2003 WL 21467204, at *13.]

■ While we acknowledge that Section 5 of the VRA is not in issue here, we nevertheless think it plain that the methodology of

creating election districts as described by Justice O'Connor in *Georgia v. Ashcroft* necessarily serves as the predicate of a state's obligation of compliance with Section 2(a). That is to say, "unpacking," or distributing the voting strength of minority groups not only into majority or safe districts but also into coalition or influence districts, is as much a tool of legislative apportionment, meeting the mandate of Section 2, as is "packing," or creating only safe majority districts. In our view, therefore, depriving the Commission of the "unpacking" tool would constitute an undue restraint on its reapportionment planning in contravention of the aims and policies of the VRA. We also think it plain that, because Newark and Jersey City constitute the largest municipal concentration of minority voters in this State, the two-district limitation of the State Constitution would deprive the Commission of the redistricting tool of "unpacking," a tool that is *now* recognized by the United States Supreme Court as one which the states *must* be free to employ if they deem it appropriate in order to protect and promote the electoral rights and interests of minority groups.

■ The Commission here made a determination that the unpacking tool should be utilized. That plan is entitled to a presumption of validity. *Davenport II, supra,* 65 *N.J.* at 135, 319 *A.*2d at 723. There can be no doubt that the Commission divided Newark and Jersey City into three districts, as it has done in the past, in order to achieve the salutary objective of unpacking by permitting the minority voters not only to elect representatives in safe districts but also by creating coalition and influence districts.

■ To now create two districts each in Newark and Jersey City would, in the Commission's view and supported by the record, constitute packing in violation of Section 2 of the VRA. Such a retrogressive redistricting plan would create "[d]ilution of racial minority group voting strength ... caused by the dispersal of blacks [and Hispanics] into districts ... where they constitute an excessive majority." *Thornburg v. Gingles, supra,* 478 *U.S.* at 46 n. 11, 106 *S.Ct.* at 2764 n. 11, 92 *L.Ed.*2d at 44 n. 11. Moreover, the federal court in *Page, supra,* 144 *F.Supp.*2d at 366, has

already found that the Commission plan establishing three districts in both Newark and Jersey City did not involve vote dilution. Section 2(b) of the VRA permits consideration of "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision" in determining whether Section 2(a) has been violated. 42 *U.S.C.A.* § 1973(b). In the 2001 general election, minorities were elected to fill approximately sixty-one percent of the Senate and Assembly seats in the six districts comprising Newark and Jersey City. To now pack all of Newark and Jersey City residents into two districts each after nearly forty years of having three districts each, thereby reducing the Senators and Assemblypersons representing those two cities by one third, would violate the VRA. The effect of two districts would now "operate to *minimize* or cancel out the voting strength of racial or political elements of the voting population." *Burns v. Richardson,* 384 *U.S.* 73, 88, 86 *S.Ct.* 1286, 1294, 16 *L.Ed.*2d 376, 388 (1966) (quoting *Fortson v. Dorsey,* 379 *U.S.* 433, 439, 85 *S.Ct.* 498, 501, 13 *L.Ed.*2d 401, 405 (1965)); Voting Rights Act Extension, S.Rep. No. 97–417 at 23, 97th Cong. 2nd Sess. (1982), U.S.Code Cong. & Admin.News 1982, 178, at 200–01. Clearly, the attempt to reduce the number of districts in Newark and Jersey City from three to two is to minimize the chance of democratic control of the Legislature.

■ The demographics presented under the Bartels plan indicate that five of the six districts for Newark and Jersey City are minority-majority districts: 28th with 73.5% minorities, 29th with 79.8% minorities, 31st with 66.0% minorities, 32nd with 57.8% minorities and 33rd with 68.9% minorities. The 27th district is a minority-influence district with 44.8% minorities. Minority-majority districts are those in which minorities represent over fifty percent of the voting age population. An influence district exists when minorities make up less than a majority of the voting-age population but the minorities nonetheless are able to elect preferred candidates when the group is large enough and cohesive enough to effectively influence elections. *Parker v. Ohio,* 263

*F.Supp.*2d 1100, 2003 WL 21219404 at *3 (S.D.Ohio 2003). Because the ideal population for each of New Jersey's forty legislative districts under the 2000 census is 210,359, and because Newark's and Jersey City's populations exceed that ideal number by 63,187 and 29,696 respectively, *McNeil, supra,* 357 *N.J.Super.* at 80, 813 *A.*2d at 1267, limiting each of those municipalities to only two districts will, of necessity, reduce the number of minority-majority districts and/or the influence district.

■■■■■ . Although the Supreme Court has heretofore declined to decide whether an influence dilution claim is cognizable under the VRA[2], we believe that *Georgia v. Ashcroft* supports our conclusion that such claims are permitted. After all, Congress enacted the VRA for the remedial purpose of "rid[ding] the country of racial discrimination in voting." *South Carolina v. Katzenbach,* 383 *U.S.* 301, 315, 86 *S.Ct.* 803, 812, 15 *L.Ed.*2d 769, 779 (1966). The VRA should be interpreted in a manner that provides "the broadest possible scope" in eliminating discrimination against minority voters. *Allen v. State Board of Elections,* 393 *U.S.* 544, 567, 89 *S.Ct.* 817, 832, 22 *L.Ed.*2d 1, 18 (1969). Those principles were reaffirmed recently when the Court restated that "[t]he purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race.... [T]he Voting Rights Act, as properly interpreted, should encourage the transition to a society where race no longer mat-

---

[2] In *Growe v. Emison,* 507 *U.S.* 25, 41, 113 *S.Ct.* 1075, 1084–85, 122 *L.Ed.*2d 388, 404 (1993), the Court expressly declined to decide whether plaintiffs could argue influence dilution in addition to vote dilution when the *Gingles* test was not satisfied. Additionally, in *Voinovich, supra,* 507 *U.S.* at 154, 113 *S.Ct.* at 1155, 122 *L.Ed.*2d at 511–12, the Supreme Court declined to address whether a reapportionment commission's failure to create influence districts resulted in a violation of Section 2 of the Voting Rights Act. A third case in which the Supreme Court avoided the issue of influence districts is *Johnson v. DeGrandy,* 512 *U.S.* 997, 1008–09, 114 *S.Ct.* 2647, 2656, 129 *L.Ed.*2d 775, 789 (1994), where the Court declined to hold that plaintiffs could not make a Voting Rights Act claim based on influence districts.

ters." *Georgia v. Ashcroft, supra,* 539 *U.S.* at ——, 123 *S.Ct.* at 2517, 156 *L.Ed.*2d at ——, 2003 *WL* 21467204 at *18 (citations omitted). Influence dilution claims will hasten the time when race will not matter.

We agree with Judge Gwin, a member of the Ohio Federal District Court three-judge panel that decided the *Parker* redistricting case, who stated:

> Most important, nothing suggests that Congress intended to limit Section 2 claims to ones involving districts where minorities were a majority of voters. The Supreme Court has also suggested that a minority influence claim may be sufficient to sustain a Section 2 results claim. In *Chisom v. Roemer,* 501 *U.S.* 380[, 111 *S.Ct.* 2354, 115 *L.Ed.*2d 348] (1991), the Court stated that to establish a Section 2 claim, the plaintiffs must show both that they have less opportunity to participate in the political process and that they have less opportunity to elect representatives of their choice. Justice Scalia dissented, arguing that this reading of Section 2 would leave "minorities who form such a small part of the electorate in a particular jurisdiction that they could on no conceivable basis 'elect representatives of their choice'" entirely without Section 2 protection. *Id.* at 409, 111 S.Ct. at 2371, 115 L.Ed.2d at 372. He further reasoned that such minorities could therefore be denied equal opportunity to participate in the political process with impunity. *Id.* The majority responded to Justice Scalia's dissent by pointing out that his argument "rested on the erroneous assumption that a small group of voters can never influence the outcome of an election." *Id.* at 397 n. 24[, 111 S.Ct. at 2365 n. 24, 115 L.Ed.2d at 364 n. 24]. Thus, the Court suggested that influence claims can be valid under Section 2 of the Act.
>
> [*Parker, supra,* 263 *F.Supp.*2d at 1113, 2003 WL 21219404 at *12 (Gwin, J., concurring).]

Additionally, one commentator in the Senate Report regarding Voting Rights Act violations asserted that influence dilution claims would be consistent with the purpose of the Voting Rights Act since " '[p]olitical effectiveness' ... not only includes the power to elect, but also ... the ability to use a group's voting strength to persuade candidates to address particular issues." Beth A. Levene, *Influence–Dilution Claims Under the Voting Rights Act.,* 1995 *U. Chi. Legal F.* 457, 468 (citing S.Rep. No. 97–417 (1982), 97th Cong. 2nd Sess. (1982), U.S.Code Cong. & Admin.News 1982). As noted previously, the Senate Report also asserts that the Voting Rights Act is violated when practices " 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.'" Levene, *supra,* 1995 *U. Chi.*

*Legal F.* at 467 (quoting S.Rep. No. 97–417 at 23, 28 (1982), 97th Cong. 2nd Sess. (1982), U.S.Code Cong. & Admin.News 1982, 178, at 205–06).

Another commentator has stated:

Indeed, § 2 refers to open participation for minority voters in the "political processes leading to nomination or election" as well as the opportunity "to elect representatives of their choice." Thus, political participation includes lobbying and coalition building in the electoral process (as well as voting) to influence an electoral outcome when a majority-minority district cannot be drawn.

... [V]ote dilution and influence dilution are very much intertwined.... A reapportionment plan might "pack" minority voters into single-member districts to prevent them from asserting influence in surrounding districts. Such "packing" occurs when the minority-preferred candidate in the majority-minority district receives excessively more votes than needed to carry the election. An influence district would serve to capture those excess votes to assert minority influence in another district.

[Stanley Pierre–Louis, *The Politics of Influence: Recognizing Influence Dilution Claims Under § 2 of the Voting Rights Act,* 62 *U. Chi. L.Rev.* 1215, 1224 (1995) (quoting 42 *U.S.C.A.* § 1973(b)).]

█ If the Bartels plan is altered such that Newark and Jersey City residents are placed in only two legislative districts each, that will result in vote dilution and therefore will violate the VRA. The Supremacy Clause interdicts that result.

### III.

#### A.

█ Although we rest our decision on the Supremacy Clause, we nevertheless point to other well-accepted doctrines in our jurisprudence that would lead to the same result. First, is the doctrine of contemporaneous construction. Since Article IV, Section 2, Paragraph 3 was added to our State Constitution in 1966, Newark and Jersey City have been divided into at least three districts. The issue in the past has been where to draw the district lines for each of the three or more districts for Newark and Jersey City and not whether there should be only two districts in each municipality. Based on the decisional law, and the long-standing, unchallenged history of certifying redistricting

plans that divided Newark and Jersey City into three or more districts notwithstanding our State Constitution's political boundary requirements, we find the doctrine of contemporaneous and practical construction to be applicable.

New Jersey courts first utilized the century-old doctrine of contemporaneous and practical construction in a limited manner, only applying the doctrine " 'to illustrate and confirm the text [of a constitutional provision], to explain a doubtful phrase[,] or to expound an obscure clause.' " *State v. Wrightson,* 56 *N.J.L.* 126, 206, 28 *A.* 56, 64 (Sup.Ct.1893) (quoting 1 *Story, Const.,* §§ 405, 407). In *Wrightson,* the Court was required to consider "[h]ow far contemporaneous exposition, long usage[,] and [especially the] practical interpretation shall control in the construction of [the challenged] constitutional provisions...." *Ibid.* The Court commented:

> Contemporaneous construction and long usage, and especially the practical interpretation by the various departments of the government, are entitled to great weight in the construction of constitutional provisions. But it is only when the words of the constitution are of doubtful significance, or the meaning is obscure, that resort to extraneous aid is permissible.
>
> [*Ibid.*]

Although the Court in *Wrightson* recognized the doctrine of contemporaneous and practical construction, it held that the doctrine did not apply in that case where contemporaneous construction of the constitutional provision involved there conflicted with the clear (overall) constitutional mandate. *Id.* at 213–14, 28 *A.* at 66–67.

As time progressed, the Court applied the doctrine of contemporaneous and practical construction to our State Constitution. In *In re Hudson County,* 106 *N.J.L.* 62, 64–66, 76–78, 144 *A.* 169, 170–71 (E. & A.1928), the doctrine of contemporaneous construction was used to determine whether the Court properly had assembled for the purpose of hearing an appeal during which the members sat en banc and decided the case. The Court commented:

> Said Chief Justice Gummere, speaking for this court in *Commonwealth Roofing Co. v. Riccio,* 81 *N.J.Eq.* 486, [488–89, 87 *A.* 114, 115–16 (E. & A.1913)]: "[W]henever

there is a debatable question as to the proper construction of a statutory provision, the contemporaneous and long continued exposition exhibited in the usage and practice under it requires the construction thus put upon it to be accepted by the courts as the true one." [(citations omitted)]. And this applies generally to the construction of the constitution.

In *State v. Kelsey,* [44 *N.J.L.* 1, 21–22 (Sup.Ct.1882), Chief Justice Beasley stated]: "Under this condition of affairs, as this case is to be tried by the court upon the merits as well as the law, this court is obliged to find, and does find, as a matter of fact, that the legislation in question has received a practical construction to the effect stated for a period of time in excess of fifty years.

Therefore, to consider the question as to the proper meaning of that legislation as an open one, would ... be utterly opposed to public policy, precedent and the admitted principles of law.

The legal rule is succinctly expressed in the maxim of the civil law, '*contemporanea expositio est fortissima.*' The doctrine has such prevalence that it is applicable not only in the exposition of statutes, but in the interpretation of constitutions of government. Its antiquity with respect to the English law is evidenced by the comment of Lord Coke, who says: 'Great regard ought, in construing a statute, to be paid to the construction which the sages of the law who lived about the time, or soon after, it was made, put upon it, because they were best able to judge of the intention of the makers at the time the law was made.' "

[*Id.* at 75, 144 *A.* at 174–75.]

In *Lloyd v. Vermeulen,* 22 *N.J.* 200, 125 *A.*2d 393 (1956), the Court "recognize[d] fully that resort may be had to contemporaneous and practical constructions for whatever aid they may fairly afford in ascertaining the true sense and meaning of constitutional and statutory provisions." *Id.* at 210, 125 *A.*2d at 398. The Court referred to Justice Heher's remarks in *In re Roche's Estate,* 16 *N.J.* 579, 587, 109 *A.*2d 655, 659 (1954), "that '[t]he meaning of [an enactment] is not ruled by [its] strict letter, but rather by the sense and meaning fairly deducible from the context,'" and in *Caputo v. The Best Foods, Inc.,* 17 *N.J.* 259, 264, 111 *A.*2d 261, 264 (1955), "that the lawgivers' intention 'emerges from the spirit and policy of the statute rather than the literal sense of particular terms.' " *Lloyd, supra,* 22 *N.J.* at 205–06, 125 *A.*2d at 395–96. Those principles were reaffirmed in *New Jersey Assoc. on Correction v. Lan,* 80 *N.J.* 199, 215, 403 *A.*2d 437, 445 (1979).

Recently, the Court has rejected a literal reading of a statutory amendment in "favor [of] a narrower and more practical construction" consistent with the amendment's intended meaning. *State v.*

*Trump Hotels & Casino Resorts, Inc.,* 160 *N.J.* 505, 527–29, 734 *A.*2d 1160, 1175–76 (1999); *see also State v. Trump Hotels & Casino Resorts, Inc.,* 314 *N.J.Super.* 651, 661, 715 *A.*2d 1052, 1057 (Law Div.1997) (stating "in the words of Judge Learned Hand, 'there is no surer way to misread any document than to read it literally' ") (citing *Lloyd, supra,* 22 *N.J.* at 205, 125 *A.*2d at 396, *aff'd,* 314 *N.J.Super.* 536, 715 *A.*2d 994 (App.Div.1998), *aff'd,* 160 *N.J.* 505, 734 *A.*2d 1160 (1999) (citation omitted)). The Court relied on the legislative history and the contemporaneous and practical construction of the amendment that had gone unchallenged for approximately twenty years, to ascertain the intent and proper construction of the legislation. *Trump Hotels, supra,* 160 *N.J.* at 527–29, 734 *A.*2d at 1175–76; *Trump Hotels, supra,* 314 *N.J.Super.* at 661, 672, 715 *A.*2d at 1057, 1064; *Atlantic City Racing Ass'n v. Attorney General,* 98 *N.J.* 535, 548, 489 *A.*2d 165, 172–73 (1985); *Lan, supra,* 80 *N.J.* at 215, 403 *A.*2d at 445; *Lloyd, supra,* 22 *N.J.* at 206, 125 *A.*2d at 396; *In re Hudson County, supra,* 106 *N.J.L.* at 75, 144 *A.* at 174–75. The trial court in *Trump Hotels* concluded that "where contemporaneous and practical interpretation has stood unchallenged for a considerable period of time, such may be regarded as of great importance in arriving at a proper construction of a statute or constitutional provision." *Trump Hotels, supra,* 314 *N.J.Super.* at 662, 715 *A.*2d at 1058 (citations omitted).

 The doctrine holds that when construing a constitutional provision, the long and unchallenged usage and practical interpretation by those charged with implementation, enforcement, and administration of the provision will prevail over the strict construction of the provision when there is good reason to question the viability and continued validity of that provision. *See State v. Trump, supra,* 160 *N.J.* at 527–29, 734 *A.*2d 1160; *cf. Cedar Cove, Inc. v. Stanzione,* 122 *N.J.* 202, 212, 584 *A.*2d 784 (1991) (discussing contemporaneous construction of legislation by administrative agencies). After this Court's decisions in *Bodine VII; Scrimminger,* and *Davenport II,* the only ambiguity remaining in the

literal language of Article IV, Section 2, Paragraph 3 of the New Jersey Constitution was whether the municipal boundaries of the 564 municipalities that are smaller than Newark and Jersey City would have to be breached when redistricting. That issue is not presented in this case and should not be addressed. Even if some ambiguity existed in respect of whether the municipal boundaries of Newark and Jersey City had to be breached, such ambiguity is a proper predicate for the application of the contemporaneous construction doctrine.

Application of that doctrine to the present case would support the conclusion that the common and unanimously agreed-upon understanding of this Court, and the legal and political communities of this State as well, is that the two-district limitation for Newark and Jersey City must be ignored. The municipal boundary requirement for Newark and Jersey City has been silently superceded by this Court for more than a quarter of a century in order to preserve the one-person, one-vote mandate. This Court must continue to depart from the narrow interpretation of the challenged constitutional provision in favor of a contemporaneous and practical construction of the language. For nearly forty years, the division of Newark and Jersey City into three or more districts has gone unquestioned. Once the boundaries of Newark and Jersey City are disregarded, the question is whether they need to be observed in any particular way, *i.e.* as two-district maximums. Our view is that *Bodine VII*; *Scrimminger*, and *Davenport II* so discredited the constitutional scheme that once the apportioners were freed, by reason of the size of Newark and Jersey City, from the municipal-boundary preservation, they *reasonably* regarded themselves as free to apply well-accepted general apportionment principles, not the two-district limitation, to those cities. Given the totality of the circumstances, that decision was entirely justified by what had to be a legitimate question as to how much of the constitutional dictate continued to apply after *Bodine VII*; *Scrimminger*, and *Davenport II*. When the decision of the Commission is viewed within the framework of the contemporaneous and practical construction doctrine, and the totality of

the circumstances as required by the VRA, it becomes clear that to construe strictly the language of Article IV, Section 2, Paragraph 3 would result in inequalities due to the *packing* of minorities into fewer districts. Packing, in turn, would dilute minorities' ability to elect representatives of their choice and thus would violate Section 2 of the VRA. Under the Supremacy Clause, the New Jersey State Constitution must yield to federal law.

### B.

■ In addition to the contemporaneous construction, the doctrine of claim preclusion also would lead us to the striking of the complaint.

■ "[R]edistricting differs from other kinds of state decision-making in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors." *Shaw v. Reno, supra,* 509 *U.S.* at 646, 113 *S.Ct.* at 2826, 125 *L.Ed.*2d at 528. The reapportionment process has traditionally involved political accommodation of competing interests of "political, religious, ethnic, racial, occupational and socioeconomic groups." *Davis v. Bandemer,* 478 *U.S.* 109, 147, 106 *S.Ct.* 2797, 2818, 92 *L.Ed.*2d 85, 115 (1986) (O'Connor, J., concurring). Consequently, "the apportionment task is primarily a political and legislative process and [ ] districting inevitably has and is intended to have substantial political consequences." *Davenport II, supra,* 65 *N.J.* at 134, 319 *A.*2d at 722.

■ "The judiciary is not justified in striking down a plan, otherwise valid, because a 'better' one, in its opinion, could be drawn." *Id.* at 135, 319 *A.*2d at 723 (citing *Gaffney, supra,* 412 *U.S.* at 753–54, 93 *S.Ct.* at 2332, 37 *L.Ed.*2d at 312). That is essentially what happened in the Appellate Division. The appellate panel struck down the Commission plan because the Commission's plan divided Newark and Jersey City into three districts. The effect of the Appellate Division's holding, is essentially an

attempt to recreate the complex process of legislative apportionment in the context of adversary litigation in order to reconcile the competing claims of [two] political ... groups. Even if ... such claims [were limited] to organized political parties, the fact remains that the losing party or the losing group of legislators in every reapportionment will ... be invited to fight the battle anew in federal court.

[*Davis, supra,* 478 *U.S.* at 147, 106 *S.Ct.* at 2818, 92 *L.Ed.*2d at 115 (O'Connor, J., concurring).]

We believe, therefore, that the present litigation could have been terminated based on the claim preclusion doctrine and the virtual representation rule.

The genesis of the claim preclusion doctrine predates our 1947 Constitution. As early as 1933, the highest Court in this State declared that "[n]o principle of law is more firmly established than that a single or entire cause of action cannot be subdivided into several claims, and separate actions maintained thereon." *Smith v. Red Top Taxicab Corp.,* 111 *N.J.L.* 439, 440–41, 168 *A.* 796, 797 (E. & A.1933). That concept was incorporated into the Judicial Article of the 1947 Constitution. It provides:

Subject to the rules of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined.

[*N.J. Const.* art. VI, § 3, ¶ 4.]

Seven years after adopting the 1947 Constitution, and twelve years before adopting the constitutional amendment involved in this appeal, this Court observed that the Judicial Article and implementing Court Rules adopted by this Court were intended to provide "a simple and flexible procedural framework designed and purposed for the just and expeditious determination in a *single action* of the ultimate merits of an entire controversy between litigants." *Ajamian v. Schlanger,* 14 *N.J.* 483, 485, 103 *A.*2d 9, 10 (1954) (emphasis added). To implement that constitutional provision, our courts have held that "a party who has elected to hold back from the first proceeding a related component of the controversy [will] be barred from thereafter raising it in a subsequent proceeding." *Wm. Blanchard Co. v. Beach Concrete Co.,* 150

*N.J.Super.* 277, 292–93, 375 *A.*2d 675, 683 (App.Div.), *certif. denied,* 75 *N.J.* 528, 384 *A.*2d 507 (1977).

The concept that a party is required to bring all possible claims in one proceeding is embodied in the closely linked concepts of *res judicata* and the entire controversy doctrine. *See Long v. Lewis,* 318 *N.J.Super.* 449, 459, 723 *A.*2d 1238, 1243 (App.Div.1999) ("The claim preclusion aspect of the entire controversy doctrine is essentially *res judicata* by another name."). Under both federal law and this State's law, claim preclusion requires that

(1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one.

[*Watkins v. Resorts Int'l Hotel & Casino, Inc.,* 124 *N.J.* 398, 412, 591 *A.*2d 592, 599 (1991) (citations omitted).]

"Claim preclusion applies not only to matters actually determined in an earlier action, but to all relevant matters that could have been so determined." *Ibid.* (citing *Angel v. Bullington,* 330 *U.S.* 183, 192–93, 67 *S.Ct.* 657, 662, 91 *L.Ed.* 832, 838–39 (1947); *Culver v. Insurance Co. of N. Am.,* 115 *N.J.* 451, 463, 559 *A.*2d 400, 406 (1989)).

"[C]auses of action are deemed part of a single 'claim' if they arise out of the same transaction or occurrence. If, under various theories, a litigant seeks to remedy a single wrong, then that litigant should present all theories in the first action. Otherwise, theories not raised will be precluded in a later action."

[*Id.* at 413, 591 *A.*2d at 599 (citations omitted); *see Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.,* 142 *N.J.* 336, 338, 662 *A.*2d 536, 537 (1995); *Giudice v. Drew Chemical Corp.,* 210 *N.J.Super.* 32, 41–42, 509 *A.*2d 200, 205–06 (App.Div.1986).]

It does not matter whether the two claims were filed in two different forums. *Blazer Corp. v. New Jersey Sports & Exposition Auth.,* 199 *N.J.Super.* 107, 112, 488 *A.*2d 1025, 1028 (App.Div. 1985).

Republican legislators and voters twice have challenged the Bartels redistricting plan in the federal district court, which has twice rejected their claims. *Page, supra,* 144 *F.Supp.*2d at 346; *Robertson, supra,* 148 *F.Supp.*2d at 443, *summarily aff'd,* 534 *U.S.*

1110, 122 *S.Ct.* 914, 151 *L.Ed.*2d 881 (2002). The plaintiffs in *Page* who filed their complaint on April 12, 2001, were African–American and Hispanic voters from districts that included Newark and Jersey City, and the Republican majority in the New Jersey Senate and General Assembly. *Page, supra,* 144 *F.Supp.*2d at 349–50 & n. 3. They sought to prevent implementation of the Bartels plan because it allegedly violated Section 2 of the VRA, their rights to Due Process and Equal Protection under the 14th Amendment, and their rights under the 15th Amendment by diluting the minority vote. *Id.* at 349–50, 353. The court upheld the plan on May 7, 2001. *Id.* at 369.

Republican elected officials and two individuals seeking election filed a separate challenge to the Bartels plan on April 27, 2001. *Robertson, supra,* 148 *F.Supp.*2d at 446. Two of the seven *Robertson* plaintiffs, one Senator and one Assemblyman, were also plaintiffs in the *Page* litigation. Although neither the entire group of plaintiffs nor the claims in *Robertson* were identical to those in *Page,* the court granted the Commission's motion for summary judgment based on the doctrine of *res judicata.* *Id.* at 452–53. The court recognized that plaintiffs shared "a clear commonality of interests" and all stood to benefit if the plan were declared invalid. *Id.* at 451. The court also found that the *Robertson* plaintiffs "engaged in tactical maneuvering" to file their own claim rather than joining the *Page* litigation. *Id.* at 451–52. Also, because the ultimate goal of the *Page* and *Robertson* plaintiffs was the same, the court held that the *Robertson* plaintiffs received adequate representation from the *Page* plaintiffs notwithstanding the fact that the two groups used different arguments with respect to whether the redistricting plan violated the VRA and the Constitution. *Id.* at 452. Finally, the court noted its concern that the issue of racial gerrymandering in redistricting "could 'assume immortality,'" and held that there was privity between the *Page* and *Robertson* plaintiffs. *Id.* at 452–53 (citation omitted).

Significantly, the court interpreted the *res judicata* test broadly because the issue implicated public rather than private rights. *Id.*

at 450, 452. Because each plaintiff in a public law case has an indirect interest in the outcome, "due process concerns are lessened[.]" *Id.* at 450 (citing *Richards v. Jefferson County,* 517 *U.S.* 793, 803, 116 *S.Ct.* 1761, 1768, 135 *L.Ed.2d* 76, 87 (1996)). "Additionally, because of the potentially large number of plaintiffs with standing in public law cases, were they allowed to raise issues continually, public law claims 'would assume immortality.' " *Ibid.* (quoting *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.,* 750 *F.2d* 731, 741 (9th Cir.1984)). Courts therefore have " 'wide latitude' " to use claim preclusion in public law cases such as this one. *Ibid.* (citation omitted).

The *McNeil* plaintiffs assert in their state-law claim that anything except a two-district plan for Newark and Jersey City would violate Article IV, Section 2, Paragraph 3 of the New Jersey Constitution. We also could preclude plaintiffs from proceeding with this litigation based on the doctrine of *res judicata.* First, the *McNeil* plaintiffs seek essentially the same remedy as the *Page* plaintiffs—invalidation of the Bartels redistricting plan. As the federal court in *Robertson* recognized, such suits that seek identical relief through alternate means "arise from the same transaction" for claim preclusion purposes. *Robertson, supra,* 148 *F.Supp.2d* at 448–49. Second, the *McNeil* plaintiffs either took part in *Page* or were in privity with the *Page* plaintiffs. Although the *Page* and *McNeil* plaintiffs offer different theories in respect of why the redistricting plan is unlawful (one group using the federal and one using the State Constitution), it is clear that both seek the same remedy. *See Robertson, supra,* 148 *F.Supp.2d* at 451 (finding that privity existed between the *Page* and *Robertson* plaintiffs pursuant to the doctrine of virtual representation).

Furthermore, legally there has been a final decision on the merits respecting the *McNeil* plaintiffs' claim because their state constitutional claim should have been raised in the federal proceeding pursuant to the doctrine of pendent jurisdiction. *Reid v. Reid,* 310 *N.J.Super.* 12, 23–24, 708 *A.2d* 74, 79–80 (App.Div.1998) (" '[I]f a federal court in a prior action would have exercised

pendent jurisdiction over related state claims that were not assert-
ed, a final judgment on the merits by the federal court precludes
raising those claims in a subsequent action in state court.'")
(quoting *Watkins v. Resorts Int'l Hotel & Casino,* 124 *N.J.* 398,
413, 591 *A.*2d 592, 599 (1991)); *Ferger v. Local 483 of the Int'l
Ass'n of Bridge, Structural and Ornamental Iron Workers,* 94
*N.J.Super.* 554, 564, 229 *A.*2d 532, 538 (Ch.Div.1967) (holding that,
where defendant failed to raise defense of plaintiff's fraud in
federal court, defendant is barred from "raising that issue" in
state court). The doctrine of pendent jurisdiction is now called
supplemental jurisdiction. 28 *U.S.C.A.* § 1367; *Raygor v. Regents
of the Univ. of Minn.,* 534 *U.S.* 533, 539–40, 122 *S.Ct.* 999, 1004,
152 *L.Ed.*2d 27, —— (2002).

Federal courts have exercised supplemental jurisdiction over
state law claims that "derive from a common nucleus of operative
fact" with a federal claim. *United Mine Workers v. Gibbs,* 383
*U.S.* 715, 725, 86 *S.Ct.* 1130, 1138, 16 *L.Ed.*2d 218, 228 (1966). In
this case, plaintiffs' state law claim that the redistricting plan
violates the New Jersey Constitution "derive[s] from a common
nucleus of operative fact" with the Equal Protection claim raised
in federal court: both challenges involve the Bartels plan's unique
effect on the State's two largest municipalities, which have a high
concentration of minority voters. *Baker v. Carr, supra,* 369 *U.S.*
at 199–200, 82 *S.Ct.* at 700–01, 7 *L.Ed.*2d at 675, made clear that
federal courts have jurisdiction to decide the constitutionality of
state apportionment plans for state legislative elections. We are
persuaded that the federal court would have exercised jurisdiction
over plaintiff's state constitutional claim because the packing of
minority voters into two districts after nearly a forty-year history
of having three districts each implicates Section 2 of the federal
Voting Rights Act of 1965. It is highly likely that the federal
court would have exercised supplemental jurisdiction over the
state law claim in order to resolve the entire redistricting contro-
versy at once. *See Gibbs, supra,* 383 *U.S.* at 726, 86 *S.Ct.* at 1139,
16 *L.Ed.*2d at 228 ("[The] justification [for supplemental jurisdic-
tion] lies in considerations of judicial economy, convenience and

fairness to litigants. . . .") Therefore, this state court action should be precluded. *Reid, supra,* 310 *N.J.Super.* at 23–24, 708 *A.*2d at 79–80.

■ Finally, although defendants did not explicitly raise *res judicata* as a defense, the Commission's brief impliedly raised the issue when it stated that this is the fourth case in which plaintiffs have attacked the Commission plan. That brief, however, cites none of the relevant cases. Although *res judicata* is an affirmative defense that may be deemed waived if not asserted, *R.* 4:5–4; *Brown v. Brown,* 208 *N.J.Super.* 372, 384, 506 *A.*2d 29, 35 (App. Div.1986), the pleading requirement is not absolute. It may be disregarded for public policy reasons or in the interest of substantial justice. Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 4:5–4 (2003). Moreover, affirmative defenses have been permitted to be raised either *sua sponte* or untimely by a party when the interests of justice or public policy were at stake. *See, e.g., Douglas v. Harris,* 35 *N.J.* 270, 281–82, 173 *A.*2d 1, 7–8 (1961) (contributory negligence); *Jackson v. Hankinson,* 94 *N.J.Super.* 505, 513–14, 229 *A.*2d 267, 271–72 (App.Div.1967) (governmental immunity raised *sua sponte*).

■ This case cries out for the *sua sponte* application of *res judicata.* The *McNeil* plaintiffs filed their complaint in state court on May 9, 2001, insisting that Newark and Jersey City each should be limited to two districts only two days after their privities in *Page* had argued unsuccessfully that each of those municipalities should have three districts, but that the district lines drawn by the Commission should be changed. There is an infinite number of plaintiffs who could be enlisted by either political party to contest this or future redistricting plans. The philosophy that undergirds *res judicata,* which elevates the needs of the public over the litigation choices of the parties, supports this approach. As the courts of this State have observed:

> The doctrine of *res judicata* is primarily one of public policy and only secondarily of private benefit to individual litigants. . . . [I]ts roots lie in the principle that public policy and welfare require a definite end to litigation when each of the

parties has had a full, free and untrammeled opportunity of presenting all of the facts pertinent to the controversy. The primary object of *res judicata* (public policy) is based upon the maxim *reipublicae ut sit finis litium*—it concerns the commonwealth that there be a limit to litigation. [(citations omitted).]

[*Kugler v. Romain*, 110 *N.J.Super.* 470, 484, 266 *A.*2d 144, 151 (Ch.Div.1970) (quoting *Desmond v. Kramer*, 96 *N.J.Super.* 96, 107, 232 *A.*2d 470, 476 (Cty.Ct. 1967) (quoting *Coca–Cola v. Pepsi–Cola Co.*, 172 *A.* 260 (Del.Super.1934)))].

The voters and duly-elected legislators from the six districts that include Newark and Jersey City under the Commission plan deserve an end to this litigation. By rewarding the *McNeil* plaintiffs for their use of different litigation strategies than those used by their privities in federal court, this Court would be assisting all aggrieved political organizations and voters to challenge redistricting plans with a never-ending stream of plaintiffs, a giant step toward the *Robertson* court's fear that McNeil-like cases could achieve immortality. The virtual representation rule could be applied to preclude multiple litigation of the same or similar issues previously raised or should have been raised in prior proceedings.

## IV.

The judgment of the Appellate Division is reversed; the judgment of the Law Division dismissing the complaint is reinstated.

VERNIERO, ALBIN, JJ., dissenting.

Pursuant to Article IV, section 2 of the New Jersey Constitution, Newark and Jersey City can be divided into no more than two State legislative districts each. The majority declares that following that constitutional mandate would violate the federal Voting Rights Act (VRA) and, on that basis, upholds the current legislative apportionment map. We cannot determine whether the majority's position is correct based on the present record. We thus would remand this matter to the Law Division, giving the current map a presumption of validity. We would allow the challengers the opportunity to demonstrate, with substantial certainty, whether an alternative apportionment plan can pass muster under federal law consistent with the New Jersey Constitution.

We do not accept the majority's conclusion that past departures from Article IV, section 2, paragraph 3 effectively have written that provision out of the State's constitution. The cases that arguably support the Court's holding were decided under circumstances not present here. Accordingly, we would not import the rationale of those decisions to this case. Simply put, Article IV, section 2 of our State's constitution remains in effect and need only yield to superior federal voting-rights principles. The recently-decided *Georgia v. Ashcroft*, —— *U.S.* ——, 123 *S.Ct.* 2498, 156 *L.Ed.2d* 428 (2003), addresses a section of the VRA that is not implicated in this case. Accordingly, *Ashcroft* does not resolve the issues before us.

Contrary to the Appellate Division, we also are not prepared at this juncture to hold that Article IV, section 2 invalidates the Commission's 2001 plan, which otherwise is presumed valid. *Davenport v. Apportionment Comm'n*, 65 *N.J.* 125, 135, 319 *A.2d* 718, 723 (1974). Neither the Commission nor the Law Division explicitly tested the notion whether Newark and Jersey City can be divided into two districts each consistent with federal law. In sum, we cannot determine the validity of the 2001 apportionment plan on the present record. We respectfully dissent.

LaVECCHIA, J., dissenting.

Article IV, § 2, ¶ 3 of the New Jersey Constitution was, until today, a vital provision of our law. A majority of the Court is content to jettison the provision based on a perceived Supremacy Clause concern. I disagree with the Court's presumption of a prior invalidation of the state constitutional provision based on past decisions of this Court. I also disagree that the record supports the majority's conclusion that, in any event, Supremacy Clause concerns require our constitutional provision to be declared unenforceable in this instance. In my view, the majority misperceives the interplay between the Voting Rights Act (VRA), 42 *U.S.C.A.* § 1973, and our State Constitution.

I.

In 2001, the Legislative Apportionment Commission adopted a plan dividing Newark and Jersey City into three legislative districts each. Litigation ensued, in which plaintiffs contended that the 2001 plan violates the mandate of Article IV, § 2, ¶ 3, which provides:

> The Assembly districts shall be composed of contiguous territory, as nearly compact and equal in number of their inhabitants as possible, and in no event shall each such district contain less than eighty per cent nor more than one hundred twenty per cent of one-fortieth of the total number of inhabitants of the State as reported in the last preceding decennial census of the United States. Unless necessary to meet the foregoing requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the State, and no county or municipality shall be divided among a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by one-fortieth of the total number of inhabitants of the State.

No one disputes that application of that mathematical formula would divide Newark and Jersey City into two legislative districts each.

On cross-motions for summary judgment, the trial court ruled, among other things, that the Commission was not bound by the restrictions set forth in Article IV, § 2, ¶ 3. The court held that the abrogation of the county-line mandate, announced first in *Scrimminger v. Sherwin*, 60 *N.J.* 483, 291 *A.*2d 134 (1972), and reexamined and reaffirmed in *Davenport v. Apportionment Comm'n*, 65 *N.J.* 125, 319 *A.*2d 718 (1974), freed the Commission from the necessity of adhering to the whole-municipality concept in cases of large municipalities such as Newark and Jersey City. The court, therefore, granted summary judgment to the Commission.

The Appellate Division reversed, declaring that the language of Article IV, § 2, ¶ 3 that requires dividing Newark and Jersey City into two districts never was invalidated under our prior case law but remains the starting point for legislative reapportionment. *McNeil v. Legislative Apportionment Comm'n of State of N.J.*, 357 *N.J.Super.* 74, 86, 813 *A.*2d 1264, 1271 (2003). The court, in

effect, granted summary judgment in favor of plaintiffs, remanding the case to the Commission for creation of a reapportionment plan that conforms with our Constitution. *Id.* at 93, 813 *A.*2d at 1275. We stayed the Appellate Division order, permitting the Commission's plan to remain in effect. 176 *N.J.* 71, 819 *A.*2d 1187 (2003).

I agree with the Appellate Division to the extent that it concluded that the constitutional provision at issue remains operable, and need only give way in the face of superior federal voting-rights principles. In other words, every legislative apportionment initiative should begin with our Constitution and if our Constitution can be adhered to consistent with federal law, it should be. I do not subscribe to the majority's conclusion that past departures from Article IV, § 2, ¶ 3 effectively have rendered that provision a nullity. I interpret our prior cases as having been decided on their unique facts and not within the context of the present dispute.

The Court addressed Article IV, § 2, ¶ 3, as it applies to counties, in *Scrimminger, supra.* The 1970 census revealed that the twenty-one counties in New Jersey had significantly different populations. *Scrimminger, supra,* 60 *N.J.* at 495, 291 *A.*2d at 141. Because of the disparity in population, "the counties, under the present distribution of the State's population, [could not] constitute separate districts. Nor [were] they suitable building blocks for the formation of meaningful districts." *Id.* at 487, 291 *A.*2d at 137. Adherence to county lines was determined to result in a violation of the one-man one-vote principle, in that constitutionally unacceptable deviations in population would occur between districts. *Id.* at 498, 291 *A.*2d at 142. Thus, in respect of counties, it was "plain that this limit in our State Constitution exceeds what the Federal Constitution permits." *Id.* at 489, 291 *A.*2d at 138.

In determining that county-line adherence was impossible, the Court had this to say about municipalities:

Municipal lines should be observed, if possible, for if they are followed, dividends may be expected in terms of furthering the relationship of these political subdivi-

sions and the State and also in terms of restraining to some extent the opportunities for drawing lines for partisan advantage. Municipalities are thus appropriate building blocks for the creation of districts. The boundaries of larger municipalities will of course have to be breached, and in this regard, the Commission *may* have to depart from the direction in Art. 4, § II, ¶ 3, concerning the division of a municipality.

[*Id.* at 497–98, 291 *A.*2d at 142 (emphasis added).]

The Apportionment Commission viewed that language as license to disregard freely the mandate of the Constitution in respect of municipal boundaries. That interpretation ignores the discussion's context: the need to ensure that "every man's vote should equal another's," and the problems created by the use of large, demographically unequal counties as building blocks. *Ibid.* Against that backdrop, and in recognition of that concern, we hypothesized that the municipality provision in the Constitution "may" have to be breached at some later date. *Ibid.* But the one-man one-vote question is not implicated here, for there is no allegation that the division of Newark and Jersey City into only two districts each would result in impermissible population variations.

Although plainly not dispositive, *Scrimminger* is important for recognizing the importance of unified municipal representation in the State Legislature. The Court acknowledged that "dividends" would flow from restrained division of municipalities in district representation in that it would foster better relations between the municipality and State, and would curb the drawing of lines for partisan advantage. *Id.* at 498, 291 *A.*2d at 142. Similarly, the United States Supreme Court has acknowledged that respect may be accorded to municipal boundaries as a "legitimate consideration" and "traditional districting principle." *Mahan v. Howell,* 410 *U.S.* 315, 329, 93 *S.Ct.* 979, 987, 35 *L. Ed.*2d 320, 333 (1973); *see also In re Legislative Districting,* 370 *Md.* 312, 805 *A.*2d 292, 319 (2002) (recognizing value of maintaining integrity of political subdivisions); *In re Reapportionment,* 160 *Vt.* 9, 624 *A.*2d 323, 330 (1993) (observing that "unnecessary fragmentation of [municipalities] limits the ability of local constituencies to organize effectively and increases voter confusion and isolation"); *Carstens v. Lamm,*

543 *F.Supp.* 68, 82 (D.Colo.1982) (recognizing frequent use of respect for municipal boundaries as criteria in evaluating redistricting plan); J. Gerald Herbert, *Redistricting in the Post–2000 Era,* 8 *Geo. Mason L.Rev.* 431, 451 (2000) (same). As the Supreme Court has stated, respect for boundaries of political subdivisions may be considered in that it

> insur[es] some voice to political subdivisions, as political subdivisions.... [L]ocal government entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions.
>
> [*Reynolds v. Sims,* 377 *U.S.* 533, 580–81, 84 *S.Ct.* 1362, 1391, 12 *L.Ed.*2d 506, 538 (1964).]

In my view, the clear, unambiguous language of our Constitution required the Commission to divide Newark and Jersey City into no more than two districts each, and could not be ignored unless it would have been impossible to comply with both federal and state requirements. See *Scrimminger, supra,* 60 *N.J.* at 489, 291 *A.*2d at 137–38. Although I acknowledge that the provision has been breached in practice in the past, without objection from either political party, it is this Court's duty when presented squarely with the question of the provision's enforceability to answer that legal question of constitutional significance cognizant of, but not foreclosed by, what went before. The unambiguous language is entitled to enforcement by this Court unless there is a contradictory requirement of higher law. *See, e.g., Stephenson v. Bartlett,* 582 *S.E.*2d 247 (N.C.2003) (holding that redistricting plan violated state constitutional mandate, and thus affirming trial court's findings that: 1) challengers of redistricting plan proved that it was possible to comply with both VRA and state requirements; and 2) defendants failed to show any federal law required violation of state constitution in order to create redistricting plan).

Before addressing the question of conflict with federal requirements, however, the majority's "contemporaneous construction" analogy requires comment. The dispute in this matter concerns not the meaning of the constitutional words. It concerns their enforceability. There is a difference in kind, not degree, between

interpretation and enforceability. The principle of contemporaneous construction may be of persuasive use when there is an ambiguity, when there is some doubt, or when the literal interpretation of an enactment creates a result that is at odds with the legislative intent underlying a statutory enactment. But that is not the case here. The constitutional words involved in this dispute are not ambiguous. Nor is enforcement of the provision at odds with any discerned legislative intent. The only question is whether the words of the Constitution themselves are enforceable, and that constitutional question is not subject to resolution based on a principle of statutory construction.

## II.

I would have gone along with my dissenting colleagues who argue for a remand of this matter to the Law Division because the parties do not agree that a plan dividing Newark and Jersey City into two districts each can be forged consistent with federal voting-rights law. We simply do not know at this point. The trial court did not test that notion because of its holding concerning the abrogation of Article IV, § 2, ¶ 3. We know that the Apportionment Commission did not try to comply, believing that it was not necessary. Thus, the answer to this question is seemingly not available from the Commission's record of its action. Assuming further proceedings are necessary, I also would have agreed to impose on plaintiffs the burden of going forward with at least one plan dividing Newark and Jersey City into two districts each along with the burden of demonstrating that it is substantially certain that such a plan would not violate federal voting-rights principles. Upon plaintiff's proof that our Constitution could have been followed consistent with federal law, the presumed validity of the Commission's 2001 plan would be deemed rebutted. *Davenport, supra*, 65 *N.J.* at 135, 319 *A.*2d at 723.

The majority dispenses with those procedural requirements, however, and proceeds to make findings and render conclusions

unsupported by this record. In so doing, the Court, in my view, misperceives the requirements of the VRA.

### III.

An understanding of the fundamentals of the VRA is crucial to the analysis of its intersection with our Constitution. Congress passed the VRA after significant examination of the problem of racial discrimination in voting. *South Carolina v. Katzenbach*, 383 *U.S.* 301, 315, 86 *S.Ct.* 803, 808, 15 *L.Ed.*2d 769, 779 (1966). Hours of hearings were held in which witnesses detailed the "literacy tests" and other means utilized in certain areas to prevent minority citizens from exercising their right to vote. *Id.* at 309, 86 *S.Ct.* at 808, 15 *L.Ed.*2d at 775.

The bulk of the VRA is aimed at the so-called "covered" jurisdictions. *Id.* at 316, 86 *S.Ct.* at 812, 15 *L.Ed.*2d at 779. The original enactment of Section 5 provided that a "covered" jurisdiction was one for which two findings had been made: (1) as of November 1, 1964, it maintained a voting "test or device," and (2) less than 50% of voting-age residents were registered on November 1, 1964. *Id.* at 317, 86 *S.Ct.* at 813, 15 *L.Ed.*2d at 780. In 1970, the scope of covered jurisdictions was extended to jurisdictions meeting that two-part test as of November 1, 1968, and in 1975 the date was again extended to November 1, 1972. Section 5 Covered Jurisdictions, available at http://www.usdoj.gov/crt/voting/sec_5/covered.htm. To date, covered jurisdictions include whole states, such as Mississippi, Alabama, Georgia, Louisiana, and South Carolina; counties, including five in California, five in Florida, and three in New York; and even municipalities, including towns in Michigan and New Hampshire. *Ibid.* Neither the State of New Jersey nor any of its political subdivisions are covered jurisdictions under Section 5 of the Act. *Ibid.*

Covered jurisdictions under Section 5 must obtain "preclearance" before making any changes in an apportionment map. 42 *U.S.C.A.* § 1973c. Changes in election procedures, including redistricting, will be precleared unless they "lead to a retrogression

in the position of racial minorities with respect to their effective exercise of the electoral franchise." *City of Lockhart v. United States,* 460 *U.S.* 125, 134, 103 *S.Ct.* 998, 1004, 74 *L.Ed.*2d 863, 872 (1983) (citation omitted). Thus, Section 5 is intended to "freeze in place at least the minimum minority influence that existed prior to the time a covered jurisdiction adopted a change." Katherine Inglis Butler, *Redistricting in a Post–Shaw Era: A Small Treatise Accompanied by Districting Guidelines for Legislators, Litigants, and Courts,* 36 *U. Rich. L.Rev.* 137, 172 (2002). In analyzing whether preclearance is warranted, then, one must compare the new plan to the so-called "benchmark" plan (*i.e.,* the existing, previously precleared plan) to ensure that the new plan provides the same extent of minority opportunity. *Ibid.* Section 5 is a safeguard of the status quo in covered jurisdictions, intended to prevent the erosion of existing minority political opportunities. No one contends that Section 5 controls this case.

Section 2, on the other hand, provides a remedy in situations in which a complainant brings an action and establishes the existence of a violation of voting rights. 42 *U.S.C.A.* § 1973a. A party successfully establishes a violation of Section 2 if "based on the totality of the circumstances," it is proven that

> the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
>
> [42 *U.S.C.A* § 1973b.]

To challenge a plan under Section 2, a party bears the burden of showing:

> (1) that a minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.
>
> [*Thornburg v. Gingles,* 478 *U.S.* 30, 50–51, 106 *S.Ct.* 2752, 2766–67, 92 *L.Ed.*2d 25, 46–47 (1986).]

A reapportionment commission certainly faces a complicated task. When drawing legislative lines, a commission must be cognizant of minority representation and aware of the possibility

that a Section 2 challenge might be brought by some future litigant. One commentator points out that, in respect of Section 2 considerations, redistricting commissions should analyze whether any of the *Gingles* factors are present when making race-based adjustments to plans. Butler, *Redistricting in a Post–Shaw Era, supra,* 36 *U. Rich L.Rev.* at 263.

The majority presumes, in the absence of a record, that the "packing" of minority citizens into the constitutionally mandated number of districts "constitutes" an outright violation of Section 2. *Ante* at 385–86. I do not. Before one can make that legal conclusion, one must be satisfied that *all three* prongs of the *Gingles* test are present. There is nothing in this barren record that comes close to analyzing what Section 2 effect this plan might have, or what effect a plan that complies with the constitutional mandate might have.

According to the majority, enforcement of our Constitution "deprives" the Commission of the ability to create influence districts. The majority considers the creation of influence districts to be "the predicate of a state's obligation of compliance with Section 2." *Ante* at 384–85. Again, that presumes that a Section 2 claim could be successful in New Jersey. To support that presumption, the majority must accept that racially polarized voting does exist in New Jersey, as required by *Gingles.* However, the record does not contain any support for that prong of the *Gingles* test. The assertion of deprivation is meaningless unless a violation of Section 2 is proven.

To the extent that the majority believes that its conclusion is compelled by recent caselaw, I cannot agree. The majority's holding, sweeping aside part of our Constitution's requirements, ignores the fact that the United States Supreme Court has never held that influence districts are a "predicate" of a state's Section 2 obligation. Indeed, it remains an open question whether Section 2 so-called "influence" claims are viable challenges to redistricting plans. An "influence district" is defined as a district in which the minority group "could influence the outcome of election contests and possibly elect candidates of its choice with white cross-over

support." Butler, *Redistricting in a Post–Shaw Era, supra,* 36 *U. Rich. L.Rev.* at 162. Thus, the proponent of an "influence-district" claim would argue that a redistricting plan is improper if it contains districts with majority populations of minority voters instead of a larger number of "influence districts" that would increase the likelihood of electing more of the group's candidates of choice. *See, e.g., Voinovich v. Quilter,* 507 *U.S.* 146, 154, 113 *S.Ct.* 1149, 1155, 122 *L.Ed.*2d 500, 511 (1993).

But the *Gingles* test—which is the current standard for Section 2 claims—suggests that a claim based on dilution of minority influence could not survive, because the first prong requires that a minority group be large enough to constitute a majority in a district. The Supreme Court recognized as much in *Voinovich, supra,* noting that if it were to assume that influence claims are actionable, "the first *Gingles* precondition ... would have to be modified or eliminated." 507 *U.S.* at 158, 113 *S.Ct.* at 1157, 122 *L.Ed.*2d at 514 (holding that Court need not reach question of influence-dilution claim because complainant failed to prove *Gingles's* third requirement (white bloc voting)). The Court has left that question for another day. *Id.* at 154, 113 *S.Ct.* at 1155, 122 *L.Ed.*2d at 511.

The majority relies on the recently decided *Georgia v. Ashcroft,* —— *U.S.* ——, 123 S.Ct. 2498, 156 *L.Ed.*2d 428 (2003), wherein the Supreme Court recognized that influence districts can be a valuable tool for redistricting authorities to employ to ensure that new redistricting plans satisfy the Section 5 retrogression analysis. There, the State of Georgia sought preclearance of its redistricting plan, arguing that its new plan, as compared to the benchmark plan in place, was not "retrogressive" because it "unpacked" minorities to create more influence districts. *Id.* at ——, 123 *S.Ct.* at 2500, 156 *L.Ed.*2d at 442. The Court held that the State's strategy of creating influence districts sufficed to establish that the new plan was not retrogressive under Section 5. *Id.* at ——, 123 *S.Ct.* at 2504, 156 *L.Ed.*2d at 442.

In analyzing whether the plan satisfied the preclearance standard, the Court noted the distinctions between Section 5 and Section 2, pointing out that the two provisions "combat very different evils, and, accordingly . . . impose very different duties upon the States." *Id.* at ——, 123 S.Ct. at 2510, 156 L.Ed.2d at 450 (quotation omitted). Indeed, the Court observed that the Section 2 inquiry "differs in significant respects from a Section 5 inquiry," in that a Section 5 inquiry is concerned solely with a "comparison of a jurisdiction's new voting plan with its existing plan." *Id.* at ——, 123 *S.Ct.* at 2510, 156 *L.Ed.*2d at 450 (quotation omitted). Thus, "while some parts of the Section 2 analysis may overlap with the Section 5 inquiry, the two sections differ in structure, purpose, and application." *Id.* at ——, 123 *S.Ct.* at 2510, 156 *L.Ed.*2d at 450 (quotation omitted).

The Court examined the standard for retrogression, noting that a plan must be analyzed by its overall effect in determining whether it retrogresses from the benchmark. *Id.* at ——, 123 *S.Ct.* at 2510–12, 156 *L. Ed.*2d at 450–55 . The Court cautioned that the ability of minority voters to elect a candidate of choice is "complex in practice to determine." *Id.* at ——, 123 *S.Ct.* at 2511, 156 *L.Ed.*2d at 451. It noted the various methods by which the State may maximize electoral success of a minority group, including the creation of majority-minority districts and so-called "influence districts." *Id.* at ——, 123 *S.Ct.* 2511, 156 *L.Ed.*2d at 451 (citing *Gingles, supra,* 478 *U.S.* at 48–49, 106 *S.Ct.* at 2765, 92 *L.Ed.*2d at 73 (O'Connor, J., concurring)). In setting forth those methods, including the creation of influence districts, the Court pointed out that "*Section 5* gives the State the flexibility to choose one theory of effective representation over the other," and "leaves room for States to use these types of influence and coalitional districts." *Ashcroft, supra,* —— *U.S.* at ——, 123 *S.Ct.* at 2512–13, 156 *L.Ed.*2d at 452–53 (emphasis added).

The majority pounces on that Section 5 analysis to hold that "unpacking" is a "tool" that cannot be taken away from the Commission. *Ante* at 384–85. In *Ashcroft,* the Supreme Court's holding was narrow: Georgia met its burden under Section 5 to

show that its redistricting plan did not retrogress from the benchmark plan. In reaching that conclusion, the Court noted that influence districts can be as effective as majority-minority districts in the context of a Section 5 retrogression analysis. To support that proposition, it cited Justice O'Connor's concurrence in *Gingles, supra,* in which she set forth the various means of reapportionment to maximize minority-voting strength.

But what the Court clearly did not do is alter its standard for a Section 2 claim: *Gingles* is still the standard. There is nothing in *Ashcroft* to the contrary. To suggest that the Court's inclusion of influence districts in its Section 5 retrogression analysis means that the failure to create such districts now presents a cognizable claim under Section 2 is to assume that the Court would overrule nearly twenty years of precedent without explicitly stating as much. The United States Supreme Court usually is not so timid in its pronouncements. The majority's leap of logic is unwarranted; its explanation not compelling. It is a leap that this Court should not take. Sadly, it is a leap that sounds the death knell for our constitutional mandate that honors the geographical boundaries of our municipalities, even the largest of them, when the State engages in legislative reapportionment. I must respectfully dissent.

*For reversal and reinstatement*—Justices COLEMAN, LONG and ZAZZALI and Judge PRESSLER (temporarily assigned)—4.

*Dissenting*—Justices VERNIERO, LaVECCHIA, and ALBIN—3.