# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3681-22

S.L.,

    Plaintiff-Respondent,

v.

D.D.,

    Defendant-Appellant.

_____

Submitted November 18, 2024 – Decided January 23, 2025

Before Judges Berdote Byrne and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket Nos. FV-08-1390-23 and FV-08-1714-23.

Peter J. McNamara, attorney for appellant.

Klineburger and Nussey, attorneys for respondent (Richard F. Klineburger, III, on the brief).

PER CURIAM

D.D. ("Darryl")[1] appeals the June 19, 2023 final restraining order ("FRO") granted by the Family Part to S.L. ("Sydney") against him. This was not the first time Sydney attempted to obtain an FRO against Darryl, her ex-fiancé, as she had voluntarily dismissed one temporary restraining order ("TRO") on October 31, 2022, and the trial court had previously denied her an FRO on April 10, 2023.

During the April 10, 2023 hearing, Sydney presented vulgar text messages sent by Darryl, a voice message from Darryl threatening to slash her tires, and an expletive-ridden text message sent to her current boyfriend, T.P. ("Teddy"), as evidence of harassment. After making specific findings of fact and conclusions of law, the first trial judge denied Sydney an FRO, finding the evidence did not amount to harassment, and specifically finding Sydney's testimony not credible. Although Sydney initially moved for reconsideration, she voluntarily withdrew her motion.

Just over two months later, Sydney again obtained a TRO against Darryl. At the June 19, 2023 FRO hearing before a different judge ("second trial judge"), Sydney presented two new occurrences she alleged were the predicate acts of

---

[1] We refer to the parties by initials and fictitious names to protect their privacy. See R. 1:38-3(d)(9).

harassment and stalking: a note Darryl left at Teddy's house ("Beer Note") and a Facebook message Darryl had posted, presumably referring to Sydney as his "crumbum ex" ("Crumbum Post"). Over Darryl's attorney's objections and contrary to the first judge's previous holding, the second trial judge determined the facts and allegations previously asserted at the April 10, 2023 hearing amounted to the predicate act of harassment. After finding Sydney was a credible witness, also contrary to the first judge's previous decision, the second trial judge concluded the Beer Note and the Crumbum Post amounted to predicate acts of harassment and stalking and granted Sydney an FRO against Darryl.

For the reasons that follow, we reverse and vacate the FRO because we find the second trial judge erred in finding the facts and allegations asserted at the April 10, 2023 hearing amounted to the predicate act of harassment, in contradiction of the first judge's final decision. Although a judge is entitled to consider previous acts of domestic violence when determining whether an FRO should issue pursuant to the second prong of Silver v. Silver, 387 N.J. Super. 112, 126-27 (2006), the first judge held those specific communications did not constitute harassment. This was a prior final order of the trial court that Sydney did not appeal. Moreover, even if the second trial judge's findings of these prior

acts as harassment had been proper, his order granting an FRO was in error because the two predicate acts alleged by Sydney on June 19, 2023, the Beer Note and the Crumbum Post, do not amount to harassment or stalking directed at her.

We glean the following facts from the record. On March 20, 2021, Darryl and Sydney became engaged after dating for fourteen years. On October 22, 2022, Darryl and Sydney attended a tailgate party together. Sydney left the party with another man she met that night, went to that man's house, and spent the night. Darryl learned of the incident and sent Sydney a slew of vulgar text messages, which the second trial judge found "would make a sailor blush." Darryl sent a picture of Sydney's belongings thrown onto the couple's front lawn and a screenshot from the Uber rideshare app logged into Sydney's account showing her trips that night.

The next day, Sydney, accompanied by her mother, returned to the house she shared with Darryl to collect her belongings. While she was at their house, Darryl called Sydney a "cunt"[2] and a "whore" and told her she would "regret this." Sydney obtained a TRO on October 25, 2022 ("TRO 1") and ended the

---

[2] The explicit language is necessary for factual accuracy and is not intended to offend the reader's sensibilities.

A-3681-22

couple's engagement on October 27, 2022. However, Sydney voluntarily dismissed TRO 1 on October 31, 2022.

On January 29, 2023, officers from the Deptford Police Department were dispatched to Sydney's house for a report of harassment. Sydney played for the officers a voice message Darryl had left her saying, in pertinent part: "I'll tell you what, if you don't return the fucking ring, the money for the car[,] and the honeymoon money, I will fucking slash your tires for the next fucking ten months." Sydney advised the officers that at the time she had received the message she had no active restraining orders against Darryl. Despite telling the officers she planned to seek another TRO against Darryl the next day, Sydney did not.

On March 28, 2023, Darryl texted Sydney's new boyfriend, Teddy, stating:

> You gotta be the smartest but dumbest motherfucker I know, a little bio of your girlfriend [you] dumb fuck. I been with that bum for [sixteen] years, she cheated on me [six to seven] different times since highschool [sic]. If she left my [P]hillies tailgate to go home with a [D]eptford kid that she known for [three] hours to get fucked, and to break off an engagement, what the fuck do [you] think she'll do to your dumbass. Did they mention that her mom had to pick her up from a dudes house where she was caught at, at 4am? Trust me buddy, [you] don[']t know what you['re] getting yourself into with her and that nut ass family. [S]o [I']m

5

here to warn ya. Not only is she fucking you but she's fucking other guys and guys at work. Not only did she cheat on me numerous times, but also with girls. Did she mention the part that she's bisexual? How about the part that she makes $22,000 a year? Or the part where she stole $7,000 cash from me? OR the part where [I] bought her car? Or the part where she[']s tellin[g] people we are swingers and never engaged. Listen man, run away. You[']re a nice guy from when [I] met you, she will ruin [your] life faster than [you] can blink. Don[']t leave cash around. 110% sign a prenup, and don[']t let her hang with [friends]. Just a heads up kid. And DO NOT listen to the sister and the mother. You can tell a lot about a person who doesn't even speak to their own family members. I've been with her since high school and never even met her real family. Be careful douche. God bless your life.

This text to Teddy prompted Sydney to file another domestic violence complaint, and she was subsequently granted another TRO ("TRO 2") based on the alleged predicate act of harassment.

An FRO hearing for TRO 2 was held on April 10, 2023. Because the predicate act named in the complaint was the March 28, 2023 text message sent to Teddy, the first trial judge assessed whether an FRO was appropriate by considering the message in light of Sydney and Darryl's prior history of domestic altercations. The trial court found the March 28, 2023 text message was not sent with the requisite intent to harass Sydney for two reasons. First, "there was no communication between the defendant to the plaintiff saying those

6

things to her," alluding to the text message to Teddy as "akin to . . . [if] [Darryl] . . . ran into [Teddy] and had a conversation with [Teddy] and said some things to . . . [him] about his relationship with [Sydney].  That's not harassment." Second, the trial court found the text message was Darryl's "free speech of saying what his experience was with [Sydney] and warning [Teddy] allegedly of what he could expect as well."  The first trial judge declined to consider anything besides the March 28, 2023 message to Teddy as a predicate act, instead opining all other episodes were examples of the prior history between the parties that should not be considered with respect to the March 28, 2023 text message because they were "too extenuated" and "not what brought [Sydney] to the [c]ourt" that day.

In addition to finding a predicate act had not been established, the trial court also found an FRO was not necessary to protect Sydney as it found her testimony to be less than credible.  Specifically, the trial court found Sydney "talked about being bruised, . . . talked about being hit, . . . talked about being hurt . . . . [but] [t]here was[not] anything to corroborate that upon cross-examination."  The first trial judge also took issue with Sydney testifying "she does[not] need the restraining order" when she voluntarily dismissed TRO 1, yet now saying she had dismissed it because she was afraid of retaliation from

Darryl, questioning whether "she is telling the truth now or [was] she telling the truth back when she dismissed the complaint . . . ." The first trial judge dismissed Sydney's complaint and request for an FRO, concluding, even in light of the couple's prior history, he "[does not] get the impression that [Sydney is] suffering from the feeling that she[ is] going to be hurt, that she feels she[ is] in danger" and, "even if there was a predicate act in this case" there was not "such a significant history between the parties that there would be a need for the [FRO] to issue."

Although Sydney originally moved for reconsideration of the April 10, 2023 FRO denial, she withdrew her motion without prejudice on June 1, 2023, for alleged reasons of judicial efficiency and because she had alleged a new predicate act had occurred since the first trial judge's final order. To support her third TRO ("TRO 3"), Sydney testified she was returning from a vacation with Teddy on April 24, 2023, when she and Teddy found the Beer Note left at the house Teddy owned with his ex-girlfriend, R.T. ("Racquel"). The Beer Note was handwritten and said "Throw this away for me Bud! signed [Darryl]. Thanks for the warm beer and grill." Sydney testified neither she nor Teddy gave Darryl permission to enter Teddy's home. The first trial judge, who heard the TRO application, found a prima facie case for issuance of a TRO.

8

An FRO hearing for TRO 3 was held on June 19, 2023, before the second trial judge. In addition to considering the Beer Note as a predicate act of harassment and stalking, the trial court also considered the Crumbum Post made by Darryl after the April 10, 2023 hearing, which states, in pertinent part, "[f]inally after months of courts and attorneys, [m]y crumbum cheating ex had to hand the ring back over. . . . Now it's for sale before I take it to my jeweler for consignment." Over Darryl's attorney's objection, the second trial judge permitted Sydney to rely on the same factual background that the first trial judge previously concluded did not establish harassment and was not significant enough to require an FRO.

The second trial judge expressed great concern over the slew of texts sent by Darryl on October 22, 2022, calling the language "inexcusable" and "anger beyond anger." He then expressed great concern over the March 28, 2023 text Darryl sent to Teddy, stating the first judge's interpretation of this language in light of the October 22, 2022 texts was "confused – not confused, but [the first trial judge] understood there was a prior bad potty mouth claim which had been dismissed. So what he had in front of him was a domestic violence restraining order based ostensibly on a text message that was sent by [Darryl] to [Teddy]." The second trial judge was "so bothered by the language" of these messages that

he concluded both acts together were "clearly acts of harassment" without further elucidation.

Addressing the Crumbum Post, the second trial judge disapproved of Darryl's use of social media to "badmouth [Sydney]" on a public post "[t]o the entire world," finding it amounted to "another act of harassment." With regards to the Beer Note, the second trial judge found Darryl "kn[ew] that [Teddy was] going to come into [his home] and [was] going to find [the Beer Note]," Darryl knew Teddy and Sydney would "know that he got into the house in some fashion," and Darryl left the Beer Note on purpose aware of the fact that Sydney was going to see it.

"[I]n light of the history" between Darryl and Sydney—including the October 22, 2022 text messages to Sydney, the March 28, 2023 text message to Teddy, and Darryl's use of Sydney's Uber account, the second trial judge granted Sydney an FRO, finding her testimony to be mostly credible,[3] and the Beer Note and Crumbum Post constituted predicate acts of harassment and stalking. Darryl subsequently moved for reconsideration on July 31, 2023, before the second trial judge, who denied the motion. This appeal followed.

---

[3] Although Darryl did not testify, Racquel appeared as a defense witness. She testified she invited Darryl into her home and sold him the grill when he left the Beer Note.

In reviewing a trial court's decision to grant an FRO in a domestic violence matter, we defer to the trial court's findings of fact as long as they are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). The trial court's conclusions of law, however, are not awarded the same level of deference "if they are based upon a misunderstanding of the applicable legal principles," and we review such decisions of law de novo. T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)).

Darryl raises two issues on appeal. First, he argues the trial court erred when granting Sydney an FRO by considering facts predating the Beer Note and Crumbum Post, which the first trial judge deemed did not constitute harassment at the April 10, 2023 FRO hearing, in violation of the "law of the case" doctrine. Second, he argues the Beer Note and Crumbum Post were not predicate acts amounting to domestic violence pursuant to N.J.S.A. 2C:25-19(a) as interpreted by this court in Silver.

In response, Sydney first argues the law of the case doctrine does not apply to domestic violence actions as a matter of law, and the second trial judge's consideration of facts predating the Beer Note and Crumbum Post were necessary to establish a previous history of domestic violence, pursuant to

11

Silver.  Sydney then argues the trial court properly held the Beer Note and Crumbum Post constitute predicate acts of harassment and stalking, making an FRO necessary.  We disagree.

When considering a domestic violence complaint, trial courts must make two distinct determinations:  "[f]irst, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Silver, 387 N.J. Super. at 125.  If the trial court finds a predicate act, only then must the court determine whether a restraining order is necessary to protect the victim.  Id. at 125-26 "[C]ourt[s], in determining whether an act of domestic violence has occurred, consider the previous history of domestic violence between the parties including threats, harassment and physical abuse, and the existence of immediate danger to person or property."  Kamen v. Egan, 322 N.J. Super. 222, 228 (App. Div. 1999) (citations omitted); see also Cesare, 154 N.J. at 402 (requiring courts to consider any "previous history of violence between the parties" (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995))); Silver, 387 N.J. Super. at 126 ("[W]hen determining whether a restraining should be issued based on . . . any of the predicate acts, the courts must consider the evidence in light of whether there is a previous history of

domestic violence, and whether there exists immediate danger to person or property.")

Although the second trial judge was correct in noting that trial courts are instructed to consider the parties' prior history of domestic violence, trial courts are constrained to abide by prior final orders of the court and cannot relitigate issues or claims already the subject of a final decision. See J.F. v. B.K., 308 N.J. Super. 387, 392 (App. Div. 1998). "Collateral estoppel is that branch of broader law of res judicata which bars re-litigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." L.T. v. F.M., 438 N.J. Super. 76, 86 (App. Div. 2014) (quoting State v. Gonzalez, 75 N.J. 181, 186 (1977)). In the present matter, a prior trial court had previously determined the text messages did not constitute the predicate act of harassment, and the second trial judge erred in essentially reversing that decision when relying on the text messages to find defendant had committed the predicate act of harassment. If Sydney disagreed with the first trial judge's conclusions in dismissing TRO 2, she was free to seek reconsideration, which she voluntarily dismissed without prejudice, or seek an appeal of that decision. She could not re-litigate that matter before a different trial judge.

In J.F., we reversed an FRO entered against the defendant based on the predicate act of harassment. Although we primarily took issue with the trial court's consideration of prior conduct never mentioned in the complaint, we also noted:

> [t]he procedural unfairness of the proceeding resulting in the finding of domestic violence against [the] defendant was compounded by the fact that plaintiff's prior complaint alleging some or all of the prior acts which the court found to constitute acts of domestic violence [in the instant case] was [previously] dismissed [at] a [prior] hearing.
>
> [J.F., 308 N.J. Super. at 392.]

We continued, "[t]herefore, even if those acts had been alleged in the [instant] complaint, [the] plaintiff would be precluded under principles of res judicata and collateral estoppel from relitigating allegations which had been decided adversely to her in the earlier hearing." Ibid.

Similar to the doctrine of collateral estoppel, "[t]he 'law of the case' doctrine embodies 'the principle that where there is an unreversed decision of a question of law or fact made during the course of litigation, such decision settles that decision for all subsequent stages of the suit.'" L.T., 438 N.J. Super. at 88 (quoting Slowinski v. Valley Nat'l Bank, 264 N.J. Super. 172, 179 (App. Div. 1993)). "Both collateral estoppel and law of the case are guided by the

14

'fundamental legal principle . . . that once an issue has been fully and fairly litigated, it ordinarily is not subject to re-litigation between the same parties either in the same or in subsequent litigation.'" State v. K.P.S., 221 N.J. 266, 277 (2015) (omission in original) (emphasis omitted) (quoting Morris Cnty. Fair Hous. Council v. Boonton Twp., 209 N.J. Super. 393, 444 n.16 (Law Div. 1985)). "However, whereas collateral estoppel may bar a party from re-litigating an issue decided against it in a later and different case, law of the case may bar a party from relitigating the same issue during the pendency of the same case before a court of equal jurisdiction." Ibid. (internal citations omitted). Therefore, the law of the case doctrine applies only to "'prevent re-litigation of a previously resolved issue' in the same case," and does not apply if the legal ruling asserted was issued in a case different from the case at bar. K.P.S., 221 N.J. at 276 (emphasis omitted) (quoting Lombardi v. Masso, 207 N.J. 517, 538 (2011)).

The law of the case doctrine does not apply to the second trial judge's decision because the FRO on appeal was not granted in the same case in which the first trial judge denied Sydney an FRO. The April 10, 2023 order denying Sydney an FRO and holding the asserted facts and allegations did not amount to predicate acts of domestic violence has a different docket number than the June

19, 2023 order under appeal. Although Darryl, in his notice of appeal, listed both docket numbers, he identified only the June 19, 2023 order as the order under appeal. The April 10, 2023 order and the June 19, 2023 order are two separate final decisions not part of the same case, and Darryl's argument that the law of the case doctrine applies accordingly fails.

Notwithstanding Darryl's incorrect assertion with respect to the law of the case doctrine, the trial court erred by impermissibly considering facts and allegations previously contended in the April 10, 2023 FRO hearing, which were rejected by the first trial judge as not evincing predicate acts of domestic violence, in contradiction of the doctrine of collateral estoppel.[4] The second trial judge's decision offended the doctrine of collateral estoppel because all five requirements of the doctrine have been met: (1) the issue of whether the facts and allegations prior to the April 10, 2023 hearing amounted to predicate acts of domestic violence was already decided in the negative by the first trial judge; (2) this issue was actually litigated by the parties; (3) a final order denying an FRO was issued and was not appealed; (4) the determination of whether the facts and allegations prior to the April 10, 2023 hearing amounted to predicate acts

_____

[4] Although not raised by the parties here, we may apply collateral estoppel sua sponte. See McNeil v. Legis. Apportionment Comm'n, 177 N.J. 364, 399-400 (2003); Arizona v. California, 530 U.S. 392, 412-13 (2000).

A-3681-22

of domestic violence was essential to the FRO's denial; and (5) the parties in the matter on April 10, 2023 are the same parties who are the subject of the June 19, 2023 order on appeal. For example, it was error for the trial court to state in the order on appeal that the March 28, 2023 text Darryl sent to Teddy was "clearly [an] act[] of harassment" when the previous trial judge concluded at the April 10, 2023 hearing it was not harassment.

Notwithstanding the foregoing, we are required to review on appeal whether the two new alleged predicate acts of harassment may constitute harassment and whether an FRO should issue. N.J.S.A. 2C:25-19 provides several enumerated offenses that may amount to predicate acts of domestic violence. See Silver, 387 N.J. Super. at 122. Included in this enumerated list are harassment and stalking, defined in N.J.S.A. 2C:33-4 and N.J.S.A. 2C:12-10, respectively. Harassment occurs whenever one "[m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm"; "[s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so"; or "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(a) to (c).

Conduct "would only qualify as a predicate act [of harassment] if it were both committed with a purpose to harass and if the act was 'likely to cause annoyance or alarm.'" J.D. v. M.D.F., 207 N.J. 458, 485 (2011) (quoting N.J.S.A. 2C:33-4(a)). Most importantly, "[h]arassment requires the defendant act with the purpose of harassing the victim." D.M.R. v. M.K.G., 467 N.J. Super. 308, 323 (App. Div. 2021) (citing J.D., 207 N.J. at 486). """A finding of a purpose to harass may be inferred from the evidence presented" and from common sense and experience."" Ibid. (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997))). The court found the two Crumbum Post amounted to harassment pursuant to section (c) of the statute "any other course of conduct that is meant to annoy or alarm" without further elaboration. It did not address stalking, other than to cite the statute.

Sydney argues the trial court correctly issued an FRO because the Beer Note and Crumbum Post amounted to predicate acts of harassment and stalking. We disagree. The Crumbum Post does not expressly identify Sydney. Moreover, Sydney would see the post only if she were actively looking at Darryl's Facebook page. Therefore, pursuant to the specific facts in this record, the act of posting the Crumbum Post could not have had the intent to harass Sydney. Similarly, the Beer Note was intended for Teddy. There is no

indication that Sydney was a resident in Teddy's home or would have seen the Beer Note. As such, the Beer Note did not purposefully target Sydney. Teddy had other legal avenues to pursue if he felt threatened by the note.

The Supreme Court has commented on how conduct directed towards a third party affects whether the alleged victim has been harassed, requiring "the victim . . . be the target of the harassing intent" when it concluded "[a] defendant's snide remarks to the [plaintiff's] new beau" made when "plaintiff was not even present" did not amount to harassment. J.D., 207 N.J. at 486. See also D.C. v. T.H., 269 N.J. Super. 458, 458-62 (App. Div. 1994) (finding harassment not present when the defendant made threatening remarks to the alleged victim's boyfriend because the threats were not made personally to the alleged victim).

The trial court's conclusion the Beer Note and Crumbum Post amounted to the predicate acts of harassment and stalking are not supported by adequate, substantial, credible evidence because there is insufficient evidence to demonstrate the Beer Note was left and the Crumbum Post was made with the purposeful intent to annoy or seriously alarm Sydney. See Cesare, 154 N.J. at 412.

For these reasons, we reverse the June 19, 2023 order granting the FRO.

Reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3681-22